Julius C. ADAMS, et al., Plaintiffs,

v.

The BOARD OF PUBLIC EDUCATION,
et al., Defendants.

Civ. A. No. 1926.

United States District Court,
M.D. Georgia,
Macon Division.

April 6, 1984.

George C. Grant, Thomas M. Jackson, Robert E. Steele, Jr., Macon, Ga., Jerry Boykin, Warner Robins, Ga., for plaintiffs.

Edward S. Sell, Jr., W. Warren Plowden, Jr., Macon, Ga., for defendants.

ORDER

OWENS, Chief Judge.

Congress, in its wisdom, made United States District Courts the guardians of the constitutional rights of all citizens by giving United States District Courts jurisdiction of and the responsibility of deciding lawsuits alleging deprivation of constitutional rights. 42 U.S.C. § 1983; 28 U.S.C. § 1343. Pursuant to that jurisdiction this court, since this lawsuit began in 1963, has been determining whether or not the public schools of Bibb County are being operated in the constitutional, non-discriminatory manner mandated by *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and subsequent decisions of the Supreme Court of the United States and the Fifth and Eleventh Circuit Courts of Appeal.

When this lawsuit began on September 14, 1963, the Bibb County public schools—

like public schools throughout the United States—were operated on a racially discriminatory basis—some 41 of 61 public schools were just for white students and some 20 of 61 public schools were just for black students. Approximately 35,000 students were attending the public schools; by race about 59% were white and 41% were black. By the beginning of the 1970–71 school year, as the result of many hearings, orders, and appellate directives, the high schools and junior high schools had been integrated by division into complexes —Northeast, Central, and Southwest—and the grammar schools had been merged using the neighborhood school concept. That concept contemplated the continued existence of some racially identifiable elementary schools. The effects of court ordered integration were being felt. The school board's October 1, 1970, report shows 32,-759 total students—17,903 or 55% white and 14,865 or 45% black, a decrease of 3,321 white students (4%) and an increase of 134 black students since October 1, 1968.

On May 3, 1972, the United States Court of Appeals for the Fifth Circuit directed that the plaintiffs' motion for the elimination of four all-black, thirteen predominantly black, and several all-white elementary schools be considered, 460 F.2d 430. In obedience to that directive this court heard from the parties in writing and in open court over a considerable period of time. In the course of doing so new black students and parents were substituted for those who began this litigation but were no longer attending these schools, and a group of white students and parents were added as representatives of an additional plaintiff class of white students and parents. This freed the defendant school board of the public misconception that its members were partial to the interests of white students and parents and the representatives of their interests in court.

After lengthy negotiations the representatives of the black students and parents, the white students and parents, and the defendant Board of Education agreed to settle the remaining issues, all of which concerned the elementary schools. On June 30, 1978, they presented their settlement agreement in the form of a consent decree to the court. Notice of the proposed settlement was given and a hearing to determine whether or not the settlement was fair was held. On September 5, 1978, the consent decree was approved subject to the resolution of three issues, one of which was whether or not to rebuild the burned L.H. Williams School. In that order the court stated:

"On June 30, 1978, the parties—plaintiff black parents and students, plaintiff white parents and students, and the defendant Board of Education—presented a proposed agreed upon order settling this class action school desegregation suit. The proposed settlement in essence approves the neighborhood school concept for the kindergarten and elementary grades of the Bibb County schools as being constitutionally sufficient even though some of those schools because of the racial composition of the neighborhood are and will likely remain predominantly of one race; makes certain changes in the geographical area served by certain schools; provides for closing some schools; and leaves to the defendant Board of Education the responsibility of continuing to operate the public schools in accordance with the present Northeast, Central, and Southwest complex concept for junior and senior high students and the neighborhood school complex for elementary and kindergarten students.

As required by Rule 23, Federal Rules of Civil Procedure, the court ordered that notice of this proposed class action settlement be given, provided for objections to be voiced in writing and provided for a hearing at which objections could be voiced and the proposed settlement would be considered. That hearing was ultimately held on Friday, August 4, 1978.

Between June 30 and the date first specified for the Rule 23 hearing, objections were voiced (a) by some of the representatives of the plaintiff black par-

ents and students to the provision of the plan which calls for the area heretofore served by L.H. Williams School—which burned in 1977 and under the proposal is not to be rebuilt—to be included in the Green Street School area, both schools having a predominantly black student body; (b) by parents of both plaintiff classes who objected to the alteration of lines of the zones in which they resided or to the closing of a particular school. *No parent wrote or voiced an objection, however, to the neighborhood school concept* being utilized for the kindergarten and elementary grades even though some of Bibb County's elementary schools are and will likely continue to be predominantly of one race.

At the August 4 hearing a large number of persons were present. Thomas M. Jackson, Esquire, moved to be permitted to withdraw the consent executed by him for the plaintiff class of black parents and students. In giving reasons Mr. Jackson said in effect that before June 30 he was led to believe that the settlement represented the wishes of the plaintiff black parents and students but that thereafter he discovered from the objections of a large number of class representatives now represented by Robert Steele, Esquire, that the settlement does not really represent their wishes. Mr. Steele was present and explained that the objections voiced by the black parents and students now represented by him centered on their concern over the proposal to not rebuild L.H. Williams School. Mr. Steele further indicated that the school board's suggestion that the court delay a decision on the question of whether or not L.H. Williams should be rebuilt until such time as the facts can be presented and considered, satisfies all the objections of the some twenty (20) representatives of the class of black parents and children that he represents. This caused the court to conclude that the settlement of this case based primarily on the utilization of the neighborhood school concept for kindergarten and elementary grades was on June 30 and is now the wish of the plaintiff class of black students and parents. The motion to withdraw their consent evidenced by Mr. Jackson's signature was therefore not granted.

After all were heard on August 4 the court approved of the settlement of the case reserving for the future the question of the use of L.H. Williams and Green Street Schools and the obligation of the defendant county commissioners to furnish whatever tax monies are necessary to effect the court's order. The court further invited the defendant Board of Education to submit a proposed final order and the other parties to comment thereon. The defendant Board of Education having submitted a proposed final order, no objections having been heard and the court having determined that the proposed order fully and fairly expresses the judgment of the court, the court finds that this class action settlement is fair, adequate and reasonable. There is no reason to believe it is the product of collusion between the parties. See *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir.1978), slip op. at 5564. It is therefore approved pursuant to Rule 23(e), Federal Rules of Civil Procedure.

To evidence the final terms and conditions of settlement as approved, they are hereinafter set forth and as set forth are made the order and judgment of the court:"

\* \* \* \* \* \*

(emphasis added)

Among those terms and conditions is the following that is the source of the present controversy between students and parents and the defendant Board of Education:

\* \* \* \* \* \*

"B. FUTURE CONSTRUCTION, SCHOOL CLOSINGS AND ATTENDANCE ZONE CHANGES.

Experience has shown under the plan now in effect that changes in attendance zones, the closing of schools, and the construction of new schools or additions

to existing schools are necessary from time to time because of various factors including changes in housing patterns, the enrollment structure between grades, fiscal considerations, and others. Future changes of this type relating to school zones and assignments as well as new construction and the closing of schools shall be made in the sound discretion of the Board. However, any such future change shall be done in a manner which will prevent the recurrence of the dual school structure and which will effectuate the continued existence of a unitary school system as established by this Consent Decree. In addition, thirty days prior to effectuating any such changes, the Board shall give notice thereof to the Court and all other parties in the case."

\*    \*    \*    \*    ⁙    \*

Pursuant to that provision the defendant Board of Education by letter dated January 27, 1984, stated:

"On December 15, 1983, the Board of Education adopted a new grade structure for the school system known as the 6–2-4 Plan, and also passed a resolution closing five elementary schools.

In accordance with the Court's order of September 5, 1978, we are hereby giving the thirty (30) days notice required before effectuating these changes.

For the Court's information, I am enclosing a copy of the attachment presented to the Board by the Instructional Services Committee which describes the changes regarding the 6–2-4 Plan in detail. Also enclosed is a copy of the transcript of the December 15, 1983 meeting at which this Plan was adopted.

The situation with regard to Ingram is a little more complicated.

The Court will recall that Ingram was one of the schools slated to be rebuilt under the Capitol Improvements Plan which was formulated and approved by the Court in 1979. In 1981, the Board voted to delay the reconstruction of Ingram and the Court was notified of this change. We have since corresponded several more times concerning the Ingram situation.

The Board desires that I bring the following matters with regard to Ingram to the Court's attention.

First, the Board is fully aware that it made a commitment in 1979 to rebuild the Ingram building, and based on information available at that time, this seemed like the proper thing to do. At the same time, the Board is fully aware that it has a legal and moral obligation to judiciously expend all tax funds.

The initial reason for delaying this reconstruction was a trend toward a declining enrollment in the area served by Ingram. However, it now appears that the trend has not continued at the rate originally anticipated. Moreover, the 7th grade will be removed from Ingram because of the 6–2–4 Plan, and projected enrollment for next school year under that plan in Grades K–6 is 418.

If Ingram is closed, new construction will be necessary at Pye in order to add six classrooms, expand the Media Center and do other construction necessary to serve all of the students in the combined zone. At this time, some number of units in the Tindell Heights Project are under renovation, and it is uncertain as to exactly what effect that may have on the situation involving Ingram's enrollment.

Because of the inability to secure capitol funding any sooner as I have discussed with the Court in previous correspondence, and because of the consideration set forth above, the Board desires to wait until this fall to appraise the actual enrollment figures in the Ingram Zone and the other situations that impact on this decision, and to make a final decision one way or the other to build or not rebuild Ingram at that time.

Finally, I have prepared a large map of the school district which has on it the present elementary zone lines together with an overlay on which I have superimposed the new elementary zone lines under the 6–2–4 Plan. I believe the Court

will find this map and overlay helpful in assessing the impact of this plan on the shape, size and location of these new elementary districts.

We will be happy to furnish any further information which the Court might desire concerning this new student assignment arrangement."

On February 8 and 9 parents representing the Parent-Teacher Association of Ingram, Hall, Unionville, Duresville, and Hunt Elementary Schools moved[1] to intervene and since doing so have participated and been heard from.

On March 5, 1984, an evidentiary hearing was held with attorneys and representatives of the intervenors, black plaintiff class, white plaintiff class, and defendant Board of Education present. Thereafter the court, in the company of counsel and school personnel, inspected each elementary school building in question, the area surrounding each building, and many other school buildings throughout Bibb County. The court also conferred with counsel and board members and personnel—at the board offices and in chambers—all in an effort to become thoroughly familiar with the school system in general and the schools in question in particular. Those discussions resulted in a modified board plan delivered to the court and counsel on March 19, 1984, and formally filed April 2, 1984. The court invited those who are critical of the board's plan to submit alternative plans, and one such plan was received. All having been considered, this constitutes the court's decision.

### The 6-2-4 Plan

No objection to the defendant board's decision to operate the public schools of Bibb County on a 6-2-4 plan having been heard, the defendant board may implement its 6-2-4 plan.

### Changes Objected To—The Issues

As the already quoted order of September 5, 1978, states, the settlement of this lawsuit "in essence approves the neighborhood school concept for the kindergarten and elementary grades of the Bibb County schools as being constitutionally sufficient even though some of those schools, because of the racial composition of the neighborhood, are and will likely remain predominantly of one race . . . ."

While the settlement agreement and consent decree does not enumerate the concerns that prompted the settlement and the agreement to continue with neighborhood elementary schools, the annual reports of the defendant board show that white students by 1978 had left the public schools in large numbers. This could have caused the parties to conclude that more extensive changes, even though required by Supreme Court and appellate decisions, would likely cause even more white students to leave, resulting in an integrated but virtually all-black public school system. Note those figures:

| Date | White Students | Percent | Black Students | Other Students | Total Students |
|---|---|---|---|---|---|
| 10/1/68 | 21,224 | 59 | 14,731 | | 35,955 |
| 6/2/69 | 20,017 | 59.3 | 13,763 | | 33,780 |
| 10/1/69 | 20,060 | 60.8 | 12,944 | | 33,004 |
| 10/1/70 | 17,903 | 54.7 | 14,865 | | 32,759 |
| 10/1/71 | 16,521 | 52.5 | 14,961 | | 31,482 |
| 10/1/72 | 15,983 | 50.8 | 15,544 | | 31,437 |
| 10/1/73 | | – not in file – | | | |
| 10/1/74 | 14,102 | 48.9 | 14,714 | | 28,816 |

1. An examination of the record reveals that said motion to intervene was never formally ruled upon in spite of being tacitly granted by notice to show cause and invitation to appear and be heard from.

| Date | White Students | Percent | Black Students | Other Students | Total Students |
|------|------|------|------|------|------|
| 10/1/75 | 13,752 | 48.3 | 14,721 | | 28,473 |
| 10/1/76 | 13,301 | 47.4 | 14,768 | | 28,069 |
| 10/1/77 | 12,817 | 46.3 | 14,838 | | 27,655 |
| 10/1/78[2] | 11,937 | 45.1 | 14,482 | 51 | 26,470 |
| 10/1/79 | 11,592 | 44.4 | 14,460 | 73 | 26,121 |
| 10/1/80 | 11,193 | 44 | 14,188 | 76 | 25,457 |
| 10/1/81 | 10,889 | 43.4 | 14,135 | 87 | 25,111 |
| 10/1/82 | 10,876 | 42.9 | 14,358 | 86 | 25,320 |
| 10/1/83 | 10,704 | 42.5 | 14,390 | 109 | 25,203 |

Note also Bibb County white/non-white population figures from 1900–1980:

| Year | Total | White Population | Percent of Total | Non-White Population | Percent of Total |
|------|------|------|------|------|------|
| 1900 | 50,473 | 23,089 | 45.7 | 27,384 | 54.3 |
| 1910 | 56,646 | 29,165 | 51.5 | 27,481 | 48.5 |
| 1920 | 71,304 | 38,269 | 53.7 | 33,025 | 46.3 |
| 1930 | 77,042 | 44,136 | 57.3 | 32,906 | 42.7 |
| 1940 | 83,783 | 48,239 | 57.6 | 35,544 | 42.4 |
| 1950 | 114,079 | 73,217 | 64.2 | 40,862 | 35.8 |
| 1960 | 141,249 | 94,076 | 64.2 | 47,173 | 35.8 |
| 1970 | 143,418 | 93,784 | 65.5 | 49,634 | 34.5 |
| 1980 | 150,256 | 91,460 | 61.0 | 58,796 | 39.0 |

Source: United States Census of Population and Housing, 1900–1980, U. S. Bureau of the Census, Department of Commerce

showing an increase of total population in 1960, 1970, and 1980, and only a slight decrease in the total white population during the time that the percentage of white students dropped from 59% to 42.5%.

The fact that in the ten years (1968–78) before this lawsuit was settled some 9,287 white students left the public schools and after it was settled (1978–83) only 1,233 left indicates that the parties had valid concerns. The post-1978 stability in number of students indicates that the settlement agreement was considered by all to be fair to all.

The settlement agreement and resulting decree eliminated possible further integration of Bibb County's elementary schools as an issue in this lawsuit. That issue remains eliminated. These changes are therefore not to be examined from the standpoint of whether or not they promote further integration of the elementary

2. Year of settlement.

schools. They are to be examined to determine whether or not these changes are fair and equitable to all who are effected and whether or not they are consistent with the settlement consent decree of 1978.

While the consent decree requires that "any such future change shall be done in a manner which will prevent the recurrence of the dual school structure ..." there is no suggestion or indication that these proposed changes are inconsistent with such provision.

### Capital Improvements—B.S. Ingram School

■ Since the 1978 settlement consent decree and the receipt of bond issue monies approved by a majority of Bibb County's voters, the defendant Board of Education has constructed three new elementary schools, each of which in every respect far surpasses every other school building in

Bibb County. They are, and they cost: Burke $2,741,301; Union $2,264,665; L.H. Williams $2,990,498.

That these new schools benefit black *and* white students is shown by their current enrollment figures: Burke 721 black, 6 white; Union 221 black, 396 white; L.H. Williams 574 black, 24 white. The taxpayers and the parties to this lawsuit should be commended for those superb accomplishments.

The report of the Board of Education as to the expenditure of the remainder of the bond funds, D–10, shows that badly needed improvements and repairs throughout the system have been accomplished. Major items include a new gymnasium/music/ROTC facility and the renovation of the old gymnasium at Central High School at a cost of $2,799,351 and a new vocational comprehensive building at Southwest High School at a cost of $2,722,565.

The settlement consent decree contemplated building a new elementary school on the present site of the B.S. Ingram School plus additional land to be acquired to meet minimum state standards for land area for new schools. The revised estimated cost is $2,600,000, which is consistent with the actual cost of Burke, Union, and L.H. Williams.

In November, 1981, the defendant board notified the parties and the court that it intended to delay the new Ingram elementary school because of the possibility it is not necessary to adequately serve the children in that area which is within easy walking distance of Pye and Burke elementary schools. The court received no objections to the announced delay and received no request to set the matter down to be heard. Between then and now all bond issue money has been committed to the point that only $987,829 remains. This, of course, is not enough to build a $2,600,000 new school.

Capital funds—those that pay for new, added to and renovated facilities—come (1) from local bond issues and (2) from state appropriations. Local bond issue money having been committed, can the defendant board expect to possibly receive state funds that could be used for a new Ingram school? If so, when?

To insure that local boards of education build wisely as needed for the future, the State Board of Education requires every school system as a condition precedent to eligibility for state money for capital building purposes to adopt a plan in accordance with state requirements and standards and to submit the plan to the State Board of Education. If approved, the legislature is asked to authorize the issuance of state bonds, and when the bonds are issued the school system receives the money and can begin the projects in question. Based on past experience, school officials estimate that at least three more years would go by before a new Ingram would actually be built, assuming the State Board of Education approved it being built.

Since state approval is based upon a realistic objective assessment of future need and there is great doubt as to the need for another new elementary school in the Burke-Ingram-Pye area, this court doubts that the State Board of Education would approve building a new B.S. Ingram School. Realistically, since this court can't compel the defendant board to spend money it doesn't have and can't compel the State Board of Education to approve funds for an unneeded new school, it is doubtful that capital funds will ever be available.

Four hundred thirty-five students now attend B.S. Ingram School. Of those, 44 are seventh graders. Under the 6–2–4 concept 391 are in grades K–6. Compared to other school buildings B.S. Ingram on a scale of one to ten—worst to best—based upon observation by the court, must be rated a one. Contributing to this rating are its small 3.9 acre campus, its substandard building, and the surrounding area, much of which exists in violation of the City of Macon's housing code.

Pye elementary school, a climate controlled, well built facility situate on 14.36 acres, is less than one-half mile from B.S. Ingram School. Using the uncommitted

$987,829 bond money, facilities sufficient to house all Ingram students, except 79 who would go to Burke, can be built *now*. Ingram students can thus be in very adequate surroundings beginning in September, 1984, instead of three or more years from now.

Three years of being educated in adequate, pleasant surroundings will in this court's considered judgment be of far greater benefit to the children of B.S. Ingram School than being educated in the existing deplorable B.S. Ingram School and waiting on a new B.S. Ingram to be built.

Even if bond money and time were not problems, good judgment would require reexamination of the board's commitment to rebuild B.S. Ingram. Geographically the situation is similar to that the board faced in choosing between L.H. Williams and Green Street Schools. There, two campuses weren't needed when one would do; here, three campuses aren't needed when two will do. Population projections indicate further decline in the Ingram area and less demand for defendant board's services. But for the settlement agreement, no one other than those directly involved would believe it wise to locate a new elementary school on an expanded Ingram site. In addition, no one likewise would believe it wise to spend more than $2,600,000 to build another new elementary school when $1,000,000 can be spent to add to an existing nearby, excellent school.

The defendant Board of Education's modified plan to add to Pye School, close B.S. Ingram School, and change the attendance zones for Pye, Burke, and Bruce is therefore approved. The defendant board shall proceed to complete the additions to Pye School by the beginning of the 1984–85 school year, reporting by letter on May 1st and each month thereafter on the progress thereof.

The defendant Board of Education has indicated a willingness to raze the present B.S. Ingram School and to deed the property to the City of Macon for use as a public playground. This would be an additional benefit to the B.S. Ingram parents and students and would be consistent with the Board of Education's duty to utilize school property for the benefit of the public. Within 180 days after B.S. Ingram ceases to be used as an elementary school, the defendant board shall raze the building, clear the land, and deed it to the City of Macon, reporting to the court when the task is completed.

### Neel School

Neel elementary school was built in 1954 and added to in 1957. It backs up to Interstate 75, which was constructed after it was built and added to, and fronts on a small area bounded by the dense, commercial Pio Nono Avenue-Westgate Shopping Center area. The presence of the interstate highway and encroachment of the commercial area have caused a steady decline of enrollment at Neel. Neel had 297 students in 1968 and now has 241 students, not counting 65 special education students. The 6–2–4 plan eliminates the seventh grade and leaves a projected 1984–85 enrollment of 177 students, not counting special education students or 25 kindergarten students. The defendant board suggests it would be financially irresponsible to continue to operate this school to serve those few students. While Neel students and parents naturally object, this court must commend the defendant board for exercising sound financial judgment, agree that the closing of Neel School is consistent with the 1978 decree, and approve the board's plan for its closing.

### Unionville

Unionville School was built in 1942 on 4 acres and was added to in 1950. While it has served a useful purpose for many years, it is outmoded. The court agrees that it is now appropriate to close its doors.

### Northeast Elementary Schools

The geographical area north and east of the Ocmulgee River and Interstate 16 is called the Northeast Complex. The

elementary schools within the Northeast Comples are Bernd, Burdell, Danforth, Duresville, Hall, Hunt, and Jones. The average daily attendance figure for September, 1983, grades K–7 show a total attendance for those seven schools of 2,682, or an average of 383 per school. With the seventh grade eliminated by the 6–2–4 plan, the projected total for September, 1984, is 2,274, or an average of 324 per existing school. Closed since 1981 because of decreased attendance, Appling A, a climate controlled building built as a junior high school in 1967 on 30.1 acres adjoining climate controlled Danforth built in 1965 on 30.1 acres, is considered by the Board of Education to be a better facility than Duresville or Hall and a more appropriate place to educate elementary grade children in the Northeast zone. The Board of Education's modified plan calls for the closing of Duresville and Hall and for the conversion of Hunt into a magnet school.

84.3 percent of the 2,682 present elementary students are black and 15.7 percent are white. The anticipated K–6, 1984 student body will be 83.7 percent black and 16.3 percent white. Those who object to their school being closed argue that these closings impact more on black students than on white. Given the fact that because of the 84% black student body any change in the Northeast will affect more blacks than whites, this argument is irrelevant to a consideration of these changes. If adopted, it would prohibit all change regardless of circumstances.

Education involves people, physical facilities, and money. The elected members of the defendant Board of Education have the terrible responsibility of providing people and physical facilities to educate all the children of Bibb County and of convincing the Bibb County Commission to collect the money to pay for those people and physical facilities from the taxpayers. The Bibb County Commission in turn must account to the taxpayers who elect commissioners every four years. It costs a substantial amount of money to operate each school building. Education of the same number of children in a lesser number of buildings would save a substantial amount of money. The Bibb County Commission and Board of Education have agreed that money saved by operating a lesser number of school buildings will remain in the school budget and be used to afford educational advantages that presently cannot be paid for.

Appling A is a superb school building. It would be financially irresponsible to continue to fail to use it. It being far superior to Duresville or Hall, it would be educationally irresponsible to fail to educate children in its better surroundings.

The arguments for and against the Northeast modified plan having been carefully considered, it is this court's considered judgment that the Board of Education's decisions are educationally and fiscally sound, are consistent with said 1978 consent decree, and are unquestionably deserving of approval by this court subject to one further change. The proposed Appling A elementary school attendance zone and the proposed Danforth attendance zone will be merged into one so that all children in that area can have equal access to both facilities. Appling A and Danforth will be identified as Danforth Elementary and Danforth Primary Schools and will be operated as one grammar school complex.

*Disposition of Closed Buildings and Unused Property*

The court reserves its ruling on the question of the disposition of all school buildings that have been or will be closed except B.S. Ingram, and invites the defendant Board of Education within 180 days to make specific proposals as to each property. After such proposals are received, the parties will be heard from and a decision will be made.

As thus changed, the defendant Board of Education's modified plan is hereby found to be consistent with the 1978 consent decree and fair in all respects. It is thus approved and may be implemented.