**Julius C. ADAMS, et al.,**
**Plaintiffs-Appellants,**

v.

**The BOARD OF PUBLIC EDUCATION,**
**et al., Defendants-Appellees.**

**No. 84–8384.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 17, 1985.

---

Thomas M. Jackson, Macon, Ga., and Theodore M. Shaw, Legal Defense and Educ. Fund, New York City, for plaintiffs-appellants.

Edward S. Sell, Jr., W. Warren Plowden and George C. Grant, Macon, Ga., for defendants-appellees.

Before KRAVITCH and CLARK, Circuit Judges, and WRIGHT *, Senior Circuit Judge.

CLARK, Circuit Judge:

This appeal is taken from a district court order, 585 F.Supp. 215 (D.C.Ga.1984), which approved a modified plan proposed by the appellee Bibb County Board of Education (Board). The plan called for expanding a school, closing selected schools, and changing various attendance zones.

The appellants initially filed a motion for injunctive relief maintaining that the Board's proposed plan: (1) was racially discriminatory in that all six elementary schools scheduled for closing under the plan had predominately black enrollments; (2) was violative of an earlier settlement agreement which provided that the Board would be committed to upgrading the physical plants in inner city schools by constructing new schools or renovating existing buildings; (3) would not prevent the recurrence of the dual school structure; (4) would place an unequal burden on blacks because it contemplated the closing of schools located in black neighborhoods while leaving intact schools located in predominately white neighborhoods; and (5) ignored alternative plans. The district court, after a full hearing and inspection of each elementary school and the surrounding areas, ruled in favor of the Board.[1] For the reasons discussed below, we affirm.

## I. FACTS

We shall not review the detailed history of this lawsuit. We merely note that this lawsuit was initiated in 1963 when plaintiffs sought to dismantle Bibb County's racially dual system of public education, and that later the district court approved a settlement agreement which concluded fourteen years of litigation. In its 1978 order approving the settlement agreement, the court recognized that:

> The proposed settlement in essence approves the neighborhood school concept for the kindergarten and elementary grades of the Bibb County schools as being constitutionally sufficient even though some of those schools because of

---

* Honorable Eugene A. Wright, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

1. An alternative plan was submitted to the district court. According to the appellants, "[i]t

recommended an alternative and more equitable plan for school closings and the creation of two new magnet schools." *Record,* Vol. 5 at 579.

the racial composition of the neighborhood are and will likely remain predominately of one race....

*Record,* Vol. 1 at 601. The final terms of the settlement agreement were made the order and judgment of the court. *Id.* at 602. The relevant provision of the settlement agreement provided:

B. FUTURE CONSTRUCTION, SCHOOL CLOSINGS AND ATTENDANCE ZONE CHANGES.

Experience has shown under the plan now in effect that changes in attendance zones, the closing of schools, and the construction of new schools or additions to existing schools are necessary from time to time because of various factors including changes in housing patterns, the enrollment structure between grades, fiscal considerations, and others. *Future changes of this type relating to school zones and assignments as well as new construction and the closing of schools shall be made in the sound discretion of the Board. However, any such future change shall be done in a manner which will prevent the recurrence of the dual school structure and which will effectuate the continued existence of a unitary school system as established by this Consent Decree.* In addition, thirty days prior to effectuating any such changes, the Board shall give notice thereof to the Court and all other parties in the case.

*Id.* at 603 (emphasis added).

Three issues were reserved for further decision by the Court. One concerned "the approval of a capital improvements plan with particular emphasis on the so-called inner city schools." *Record,* Vol. 3 at 225B.

In 1979, the Board filed a proposal for capital improvements throughout the school system. The proposal included figures for the construction of three inner city

schools, L.H. Williams, Burke and Ingram. *Record,* Vol. 3 at 213B.

On January 27, 1984 the court was informed by letter that the Board had "adopted a new grade structure for the school system known as the 6–2–4 Plan and also passed a resolution closing five elementary schools." *Record,* Vol. 1 at 447.[2] The schools to be closed were Duresville (90% black), Hall (73% black), Hunt (94% black), Unionville (100% black) and Neel (62% black). Initially, the Board decided to defer its decision regarding the reconstruction of Ingram; however, it later voted to close Ingram.

## II. ARGUMENTS ON APPEAL

The appellants maintain that the district court applied improper standards for reviewing the school board's plan. They assert that the district court's ruling tainted the court's actions so strongly that standing alone it warrants reversal. The ruling which the appellants question provides:

The settlement agreement and resulting decree eliminated possible further integration of Bibb County's elementary schools as an *issue* in this lawsuit. That issue remains eliminated. These changes are therefore not to be examined from the standpoint of whether or not they *promote further integration* of the elementary schools. They are to be examined to determine whether or not these changes are fair and equitable to all who are effected and whether or not they are *consistent with* the settlement consent decree of 1978.

*Record,* Vol. 1 at 607.

Next, the appellants claim that the district court erred because the plan which it approved placed disproportionate burdens on the black plaintiffs. The final contention of the appellants is that the district court erred because it did not find that the Board violated its earlier ruling to rebuild

---

**2.** The school system had previously operated under a 7–2–3 organizational plan, i.e., seven grades in elementary school, two grades in middle school, and three grades in high school. Under the 6–2–4 organizational plan, there

would be six grades in elementary school, two grades in middle school and four grades in high school. *See Record,* Vol. 5 at 8–9. No objection is made to the Board's adoption of the 6–2–4 organizational plan.

Ingram and to perform substantial repairs on several other schools.[3]

The appellees contend that the only issue before this court is whether the Board complied with the consent decree. According to the appellees, "[t]he decree returned to the school board the power to make future changes relating to organizational structure, attendance zone lines and closing of schools subject to the requirement that such changes be done in a fashion as to avoid the recurrence of a dual school structure." *Appellee's Brief* at 6.

### III. DISCUSSION

At the outset we observe that the plaintiffs-appellants have not, in the district court nor in this court, made clear the constitutional dimension of the alleged wrongs in the school board plan. It is doubtful if any board anywhere has ever devised a plan that closed some schools, expanded others, and changed boundary lines, that did not cause dissension and complaints. Appellants had the burden of showing that this board plan did violence to the unitary school system established by the prior decree. They failed to address that essential issue.

■ Recently, in *Pitts v. Freeman*, 755 F.2d 1423 (11th Cir.1985) we observed that until a school system achieves unitary status, "it has an affirmative duty to eliminate the effects of its prior unconstitutional conduct." *Id.* at 1426. The settlement agreement, which became the order and judgment of the court, specifically provided that "any such future change [such as construction of new schools and the closing of schools] shall be done in a manner which *will prevent the recurrence of the dual school structure and which will effectuate the continued existence of the unitary school system as established by this Con-*

sent *Decree." Record,* Vol. 1 at 603. Thus, the Board had an affirmative duty to act in a manner that would prevent a recurrence of the previous dual school system, or stated differently, that would maintain the agreed upon unitary system. *See Pitts v. Freeman,* 755 F.2d at 1427.

■ We have recognized that this duty is violated when a school board "fails to consider or include the objective of desegregation in such decisions as whether to construct new facilities." *Id.* Moreover, since the schools which the Board proposed to close had predominately minority student bodies, the Board had a heavy burden to explain the reasons supporting its proposal. *See Arvizu v. Waco Independent School District,* 495 F.2d 499, 505 (5th Cir.1974). To meet its burden, the Board was required to "adduce evidence sufficient to support the conclusion that their actions were not in fact motivated by racial reasons." *Id.* at 505.

■ We think the Board met its burden. The record reflects that the Board reviewed a detailed study which examined attendance figures, organizational structure, the size of schools, the racial composition of the schools, finances, and other factors. *See Record,* Vol. 1 at 451–470. The Board also examined the location of the schools, the proximity of the schools to other schools and the physical condition of the schools. After many discussions and three public hearings, the proposal to close several schools was adopted. Later, after further discussion, the Board voted to close and not rebuild Ingram. There was no evidence that any schools that remained open operated under the same handicaps as those which the Board proposed to close. *See, e.g., Arvizu v. Waco Independent School District,* 495 F.2d 499, 505 (5th

---

**3.** The appellants also assert that the court did not allow it to pursue evidence showing the racially discriminatory intent of the Board. They also argue that the court incorrectly placed the burden of proof on the appellants. These arguments are without merit.

It is clear that the parties to this suit had adequate opportunities to present evidence. The

record reflects that the appellants offered one witness. Moreover, the appellants do not direct us to any of their attempts to produce evidence regarding this issue to the district court. We also disagree with the appellants' characterization of the district court's application of the burden of proof. Thus, we will not address these issues.

Cir.1974) ("To the extent that other schools which were kept open operate under the same handicaps from which the closed schools suffered, the viability of the Board's justifications is diluted commensurately."). Moreover, as the appellees' uncontroverted observation points out, "moving the seventh grade to the middle school complexes will *totally integrate the seventh grade* so that the all-black or virtually all-black schools which remain will contain only grades K through 6." *Appellee's Brief* at 17.

■ Appellees failed to present to the district court any evidence that racial factors influenced any decisions made by the School Board, nor was any evidence offered that would infer such. Plaintiffs' principal witness was a Board member who had objected to closing the Ingram School. In fact, this is the chief issue about which plaintiffs complain—that the Board did not keep its commitment to keep open Ingram grammar school.[4]

We are persuaded that the factors considered by the Board were fair, legitimate, and in the best interest of the school system. As we stated in *Lee v. Anniston City School System*, 737 F.2d 952 (11th Cir.1984) "[a]lthough the federal courts have a broad constitutional mandate to ensure that a unitary school system is achieved, the Supreme Court has stressed 'school authorities have the *primary* responsibility for elucidating, assessing and solving these problems....'" *Id.* at 955 (emphasis in original).

The Board, after considerable thought and judgment, utilized its discretion to close several schools which it concluded

could no longer be operated in the best interest of the public.

The plaintiffs oppose some parts of the plan and most particularly the closing of Ingram. However, our careful review of evidence does not uncover any facts that would demonstrate that racial motives played any part in the Board's decision making. We are also persuaded by the proximity of three other reasonably new grammar schools that can serve the pupils attending Ingram in view of its dilapidated condition and the cost of building a new school.

Finding no violations of the former consent decree and no racial implications in the Board's actions, the judgment of the district court is

AFFIRMED.

---

**4.** The district court found that the bond issue money that had been raised to build Ingram had been committed to a point that would not permit the construction of a new school. The court also found that it would take three years to construct a new Ingram assuming that the State Board of Education approved its construction. The court concluded that it was doubtful that state approval would be obtained since the state would conduct a realistic assessment of future need and since there was great doubt as to the need for another elementary school in the area.

Last, and perhaps most important, the district court found that "[c]ompared to other school buildings, B.S. Ingram on a scale of one to ten—worst to best—based on observation by the court, must be rated a one." The court further observed that "[t]hree years of being educated in adequate, pleasant surroundings will in this court's considered judgment be of far greater benefit to the children of B.S. Ingram School than being educated in the existing deplorable B.S. Ingram School and waiting on a new B.S. Ingram to be built." *Record*, Vol. 1 at 12–13.