[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
04/08/99
THOMAS K. KAHN
CLERK

_____

No. 96-9062

_____

D. C. Docket No. 1:69-CV-12972-RLV

UNITED STATES OF AMERICA, et al.,

Plaintiffs-Appellants,

versus

STATE OF GEORGIA, Meriwether County,
MERIWETHER COUNTY,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(April 8, 1999)**

Before ANDERSON and BARKETT, Circuit Judges, and HILL, Senior Circuit Judge.

ANDERSON, Circuit Judge:

## I. OVERVIEW

The United States and intervenors Charles Ridley et al. (collectively "Plaintiffs") appeal

from the district court's order approving the Meriwether County Board of Education's ("Board")

"Five Year Facilities Plan" ("Plan"). Plaintiffs contend that the district court applied the wrong

legal standard in gauging the Plan and assert that the court's subsequent approval of the Plan constituted an abuse of discretion. For the reasons stated below, we disagree. Accordingly, we affirm.

## II. FACTS AND PROCEDURAL HISTORY

The facts relevant to this appeal begin in 1988. The point of contention was the issue of a consolidated high school for Meriwether County.[1] Plaintiffs favored the construction of a consolidated school, whereas the 1988 Board did not. In April of 1988, following the election of a new Board, the new Board disavowed an earlier proposal adopted by the 1987 Board prior to the election that had promoted the construction of a consolidated high school. The Board's about face against consolidation was due to a shift in its political alignment–a majority of the board now opposed consolidation, whereas only months before a majority had favored it.

More than a year later, in July 1989, the Board, having abandoned the consolidation model, formally decided to adopt a new construction plan that would involve two high schools and that would be financed by a bond issue. The bond issue was to be passed by referendum. Soon thereafter, on October 16, 1989, the Plaintiffs filed in district court, arguing that abandonment of the consolidation plan violated the 1973 desegregation order ("1973 Order").[2]

---

[1] For a fuller account, please see United States v. Georgia, 19 F.3d 1388, 1390-91 (11th Cir. 1994).

[2] A three-judge panel of the Northern District of Georgia entered the 1973 Order permanently enjoining Meriwether County, and several other counties, from taking any action "which tends to segregate students or faculty by or within schools on the basis of race, color or national origin." 1973 Order at 6. In outlining the school districts' desegregation obligations, the order also stated that: "All school construction, school consolidation and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the reoccurrence of the dual school structure." 1973 Order at 7.

The 1973 Order is the same order with respect to which an intervenor in a companion

2

Accordingly, they sought, among other relief, an order from the district court mandating the pursuit of the earlier plan calling for the construction of a consolidated high school. As a preliminary response to Plaintiffs' filing, the district court entered an order directing the State of Georgia to freeze state funds which had been previously been allocated to the Board for the construction of a consolidated high school. The district court then set a bench trial for 1990.

At the conclusion of the bench trial in 1990, the district court declined to order that Meriwether County build a consolidated high school.[3] The court did order the closing of one high school, Woodbury High School, halted intra-district transfers (except majority-to-minority transfers) and halted new inter-district transfers (except for students who lived within the Manchester city limits of Talbot County). Furthermore, the court ordered equalization of the curriculum of all schools in the district and achievement of racial balance in teaching and staff

_____

case takes the position that the 1973 Order constituted a finding of "unitary status." No such argument is made in this case, but in any event, we reject that argument in the companion case in a decision issued simultaneously with this decision. See United States v. Georgia, __ F.3d __ (No. 97-9199, 11th Cir. 1999).

[3] Regarding the consolidation issue, Judge Robert L. Vining, Jr. stated:

> I will not make a decision in this case on the basis or having as one of its premises that one high school would be superior to two. I do not think that's for me to say. It may be that one high school would be superior to two, but I think the basis of my decision must be, or the standard must be, whether the plan as adopted and put into effect by the school board at my direction will ensure that a segregated system is not maintained or returned to. I think that, broadly speaking, that has got to be the basis.

Transcript of Proceedings, May 31, 1990 Hearing at 98.

3

assignments. Again, however, the court did not order consolidation. No appeal was taken from this ruling.

In January 1993, the Board realigned itself, and again moved toward the construction of a consolidated high school. At the request of all parties, on January 27, 1993, the district court ordered the State of Georgia to release the state funds that had been earmarked for the building of the consolidated high school to Meriwether County. Nine days later, Coleman Bass[4] and others opposed to consolidation filed a motion to intervene, seeking to enjoin the distribution of the funds for consolidation. All parties to the litigation opposed the intervention, and on March 2, 1993, the district court denied the intervention motion.[5]

On May 27, 1993, before the funds for construction had been released, however, the putative intervenors succeeded in enjoining the Board from pursuing the consolidation project by winning a temporary restraining order from Fulton County Superior Court Judge William Daniel.[6] The Board appealed the decision to the Georgia Supreme Court, but that court dismissed the appeal on October 31, 1994. Meriwether County Board of Education v. Bass et al., Docket No. S95A0115, (Ga. 1994). The Board then approached the populace of Meriwether County for guidance, placing before it in a referendum the issue of closing the two existing high schools,

---

[4] Coleman Bass was the former chairman of the Board who had opposed the original consolidation plan. See United States v. Georgia, 19 F.3d at 1392 n.4 (commenting on Bass' former political position).

[5] This court subsequently affirmed in United States v. Georgia, 19 F.3d 1388 (11th Cir. 1994).

[6] Judge Daniel enjoined the consolidation effort based on his view that O.C.G.A. § 20-2-260 had not been satisfied. That statute mandates, inter alia, that a school board hold at least two public hearings to provide an opportunity for full discussion of a consolidation plan. See United States v. Georgia, 19 F.3d at 1392 n.5 (discussing statute).

4

Greenville and Manchester, and building a consolidated school. The voters rejected the proposal on November 8, 1994.

Defeated yet again, the Board abandoned the consolidation effort and returned to developing a new facilities plan using a two-high school model. After several modifications, the final version of the Plan was adopted by a unanimous Board.[7] The Board submitted the Plan to the district court for approval on January 23, 1996. The court approved. The United States and the intervenors ("Plaintiffs") did not sign on, however. They filed objections to the Plan on March 22, 1996. The district court issued an opinion approving the Plan on August 22, 1996, and disagreeing with the Plaintiffs that the Plan constituted a violation of the school district's desegregation obligations. Plaintiffs now appeal that ruling.

III. STANDARD OF REVIEW

A district court's approval of a proposed facilities plan is reviewed for abuse of discretion. Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1091 (11th Cir. 1992). Its findings of fact are reviewed under the clearly erroneous standard. Lee v. Anniston City Sch. Sys., 737 F.2d 952, 955 (11th Cir.1984)(citing Ross v. Houston Independent Sch. Dist., 699 F.2d 218, 226 (5th Cir. 1983).[8]

---

[7] The bond referendum to provide the financing for the construction called for under the Plan later passed in September 1996.

[8] Plaintiffs do not argue that we should not apply the clearly erroneous standard with respect to the findings of fact and the overall abuse of discretion standard. Rather, Plaintiffs argue only that the district court abused its discretion, and point to specific instances in which the district court allegedly applied an erroneous legal principle (which we address below).

## IV. DISCUSSION

At core, a federal court's obligation is to enforce the constitutional mandate "[t]hat the duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional de jure system." Freeman v. Pitts, 503 U.S. 465, 487, 112 S.Ct. 1430, 1443 (1992). But while the court clearly has as its goal to remedy the underlying constitutional violation, a federal court "in devising a remedy must take into account the interest of state and local authorities in managing their own affairs, consistent with the Constitution." Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757-58 (1977); see also Freeman, 503 U.S. at 489, 112 S.Ct. at 1445 ("We have said that the court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.")(citing Milliken). Indeed, this court has pointed out that "[o]ne of the ultimate considerations in a desegregation case is that the basic administration of a school district, such as the number and location of schools, should be left to the political process." United States v. Georgia, 19 F.3d 1388, 1392 (11th Cir. 1994). Thus, while the school district has a continuing obligation "to act in a manner that would prevent a recurrence of the previous dual school system," Adams v. Board of Pub. Educ., 770 F.2d 1562, 1565 (11th Cir. 1985), it is a federal court's duty to recall, upon a showing of good faith by the school district that it has complied with the desegregation order to the extent practicable, that the "'school authorities have the primary responsibility for elucidating, assessing and solving these problems.'" Lee v. Anniston City Sch. Sys., 737 F.2d 952, 955 (11th Cir. 1984)(quoting Milliken v. Bradley, 433 U.S. at 281, 97 S.Ct. at 2757). Against this backdrop, we approach the narrow question presented here–whether the district court abused its discretion in approving the Board's Plan. Plaintiffs

6

argue generally that the district court abused its discretion in approving the Plan, and they point to specific instances in which they contend that the district court applied erroneous legal principles. We address both in our discussion below.

First, we address Plaintiffs' argument that the district court employed the wrong legal standard by improperly focusing solely on whether the Plan stemmed from any impermissible racial animus and by thus neglecting the school district's affirmative duty to remedy the effects of segregation. In sum, they assert that the district court incorrectly based its stamp of approval on the faulty legal premise that any "facilities plan is acceptable as long as it is not discriminatorily motivated." Brief of United States at 24 . We do not believe this fairly characterizes the district court's order.

Rather than focusing exclusively on intentional discrimination, the district court merely discussed the absence of evidence indicating that racial motives played any part in the Board's decisionmaking process. This observation is certainly a relevant one under the law of this Circuit. See Adams v. Board of Public Educ., 770 F.2d 1562, 1566 (11th Cir. 1985) (noting that plaintiffs failed to present any evidence that racial factors played a part in board's decisionmaking process); Lee v. Anniston City Sch. Sys., 737 F.2d 952, 956-57 (11th Cir. 1984)(discussing whether school closing was racially motivated and concluding it was not). The district court considered the absence of racial animus as only one factor in its examination of the Plan, and having checked that factor off its list for lack of any supporting evidence, moved on to consider other factors–such as the effects of the Plan. We cannot say this methodology was an abuse of a discretion.

Indeed, any plan that was motivated by discriminatory intent would certainly perpetuate the vestiges of discrimination and thus would not meet the school district's obligation under Freeman.

7

By frontally eliminating this possibility, the court was simply attacking the case from the ground up, and considering the multifaceted inquiry that desegregation jurisprudence entails. We cannot fault the approach of looking first to motive and then to effects.

In addition to the lack of intentional discrimination, the court went on to consider five of the six factors from Green v. County School Bd. of New Kent County, 391 U.S. 430, 437, 88 S.Ct. 1689, 1693 (1968). The six Green factors are: student assignments, transportation, faculty, staff, extracurricular activities, and facilities. Id. By addressing the lion's share of these factors, the district court applied the proper legal standard articulated in Green, for the Green factors are the guideposts in a court's determination as to whether a proposed plan would eliminate the "vestiges of de jure segregation . . . as far as practicable." See Board of Educ. of Oklahoma City v. Dowell, 498 U.S. 237, 250, 111 S.Ct. 630, 638 (1991)(stating that courts should look to the Green factors in considering whether vestiges of past discrimination have been eliminated to the extent practicable). Therefore, we are satisfied that by following the directives of Green, the district court employed the proper legal standard in gauging the Plan–that is, whether the Plan eliminated the vestiges of prior de jure segregation to the extent practicable.

A. Student Assignments

One such vestige, indeed the hallmark of a dual system, is schools that are markedly identifiable in terms of race. Freeman, 503 U.S. at 487, 112 S.Ct. at 1443. The district court expressly addressed the Plaintiffs' concerns regarding racial identifiability with respect to student assignments on pages 6 and 7 of the order, finding that, none of the schools were projected to have

8

an enrollment that differed more than 20% from the district-wide ratio, and that the schools were not impermissibly racially identifiable. Order at 6-7.[9]

Plaintiffs now argue that the district court employed the 20% deviation figure as the universal legal benchmark and that such a tactic constitutes an abuse of discretion. This argument misreads the district court opinion. The district court expressly acknowledged in its racial identifiability analysis "that there is no magic statistical number which can be utilized to determine whether schools are racially identifiable." Order at 7. The court did go on to conclude, however, that a " +/- ratio of 20% is not enough in and of itself to warrant such identification." Order at 7. Other courts have also utilized such a 20% deviation figure. See, e.g., Freeman, 503 U.S. at 476, 112 S.Ct. at 1438; Stell v. Board of Educ., 860 F. Supp. 1563, 1570-71 (S.D. Ga. 1994).

Plaintiffs' argument seems to suggest that because the enrollment percentages deviated by no more than 20% from the district-wide average, that the district court closed its eyes to all of Plaintiffs' evidence regarding racial identifiability. This is simply not the case. The court considered Plaintiffs' arguments regarding community perceptions and past and current enrollments. There is ample evidence in the record to support the district court's finding with respect to lack of racial identifiability, and its conclusion in this regard was not clearly erroneous.

---

[9] According to Defendants, once the Plan is implemented, of the system's seven schools, one will be close to perfectly racially balanced (North Elementary); two schools will be within 10% of the county-wide ratio (North Middle and South Middle); two will be within 15% of the county-wide ratio (South Elementary and South High School); and two will be within 20% of the county-wide ratio (North High and Middle Elementary). None of the schools deviates by more than 20% from the county-wide ratio of 65% black and 35% white.

Plaintiffs would have us impose an obligation on the Meriwether County school district that is far stricter than the one announced by the Supreme Court in Freeman. The court clearly stated in Freeman:

> That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in non-compliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

Id., 503 U.S. at 494, 112 S.Ct. at 1447.

Meriwether County's population center is located in the southern portion of the county and that portion contains a larger percentage of white residents than do the central and northern portions of the county. Thus, it follows that the northern and central schools would have a higher percentage of black students than those in the southern region. The district court found, however, that this is the result of the above stated demographics and is not traceable to a prior de jure policy of segregation. We cannot conclude that this finding is clearly erroneous. Plaintiffs concede as much by stating that "[w]hile it may be true that the present population of the high schools as well as that of the elementary schools reflects residential patterns in the county, it is not written in stone that this relatively small county must be divided on a north-south axis for school attendance purposes. Traveling from north to south and vice versa to attend school is not impossible." Brief of United States at 32.

Plaintiffs' contention ignores the teaching of Freeman that racial balance is not an end in itself. Therefore, while it is not "impossible" to dramatically alter the attendance zones, neither is it necessary under Freeman, so long as they are not vestiges of past discrimination. The law does not make a school district a prisoner based on factors, such as demographic tendencies, that are

10

beyond its control. This is the clear import of <u>Freeman</u>. <u>See id.</u> at 495, 112 S.Ct. at 1448 (noting that where racial imbalances spring not from state action but from private choices the imbalances do not have constitutional implications). Once a court satisfies itself that the enrollment patterns are not the product of <u>de jure</u> segregation, as the district court did here, the school district need not wage a battle against demographics to achieve perfect racial balance. <u>Freeman</u>, 503 U.S. at 494-95, 112 S.Ct. at 1447-48.

An important consideration in this context is the school district's good faith. <u>Freeman</u>, 503 U.S. at 494, 112 S.Ct. at 1448; <u>Lee</u>, 737 F.2d at 956 (11th Cir. 1984). Meriwether County has demonstrated its good faith by pursuing a consolidated high school in 1993 and 1994, characterized by the Plaintiffs as the most desegregative alternative, and arguing against the intervention of those who opposed consolidation in <u>United States v. Georgia</u>. Having lost the fight for consolidation[10] in state court, and at the polls, and recognizing that the entire school system was in need of significant repair, the Board decided to pursue a course that was the most practicable and the most beneficial to the most schools in the county.[11] We are persuaded that the Board did arrive at the current Plan in a good faith attempt to comply with its desegregation obligations to the most practicable extent.

---

[10] The issue of a consolidated high school, <u>vel non</u>, was also fully litigated before Judge Vining, and in 1990 Judge Vining held that a consolidated high school was not constitutionally required. See <u>supra</u> note 3. Plaintiffs do not ask us to revisit that ruling.

[11] Phase 1 of the Plan proposes the construction of three new buildings: a new North Elementary School (to house the student populations of Luthersville Elementary and McCrary Elementary); a new North High School (to house students who previously attended Greenville High School); and a new South Elementary School (to house the current students of Warm Springs Elementary and Manchester Elementary). It is worth noting that each section of the county will receive a new building under Phase 1 of the Plan, including the northern regions of the county, which have the larger percentage of black students.

Another important consideration is what this court has referred to as "the limits of practicalities such as funding and transportation." Lee, 737 F.2d at 957. Meriwether County has encountered severe difficulty in recent years in passing bond referenda to finance school construction projects. In fact, not one succeeded until September 1996[12]–the one approving funding for the Plan currently challenged by Plaintiffs. Yet Plaintiffs would have us set aside this success, because, in their eyes, a Plan could be adopted that would achieve more perfect racial balance.[13] As noted above, there was no obligation in Freeman to remedy imbalances that are a function of demographics; the circumstances are similar here, and there is likewise no such obligation here. The district court must view the Plan by the standard that it must eliminate the vestiges of the prior unconstitutional system to the extent practicable. Freeman, 503 U.S. at 492, 112 S.Ct. at 1446. Dramatically altering attendance zones, when not constitutionally required, and demonstrably politically unpopular,[14] is not a necessary path to take. Accord Lee, 737 F.2d at 956

---

[12] Notably, the Plan received the unanimous approval of the Board before it was sent before the county in the 1996 referendum. This unanimity was no doubt instrumental in the Plan's ultimate success in the referendum. Defendants assert that this unanimity was achieved for three reasons: (1) the Plan did not alter the attendance zones which had been in place (excepting the adjustments made after the closing of Woodbury High School in 1990) since the 1973 Order; (2) the Plan identified the three schools in the most need of replacement: Greenville High School, Luthersville Elementary, and Warm Springs Elementary; and (3) the Plan would provide Manchester–the population hub of the county–with a new facility, thereby increasing the chance of a successful bond referendum. These reasons do not violate the constitutional mandate of Freeman. Indeed, they seem to fall comfortably within it and embody precisely the sort of local political decisionmaking that is essential to "the basic administration of a school district." United States v. Georgia, 19 F.3d at 1392.

[13] Plaintiffs' suggested alternatives mask their real desire to have a consolidated high school. As previously noted, the district court refused to order consolidation after a bench trial in 1990, and a consolidation proposal was defeated by Meriwether County voters in 1994.

[14] As mentioned above, altering the school attendance zones would have been unpopular and would have produced divisiveness among the Board members and in the community, thereby tainting the likelihood of a successful bond referendum and dashing with it the hope of financing

12

(rejecting the plaintiffs' argument favoring a plan for the purpose of achieving even greater desegregation under circumstances similar to those in the instant case). All parties agree that the schools in Meriwether County are in poor condition and continue to deteriorate. Where, as here, there is no evidence of intentional discrimination and the Plan is consistent with the obligation to eliminate any vestiges of past <u>de jure</u> segregation to the extent practicable, we agree with the district court that the economically feasible Plan which has already been approved by the voters of

---

any new school construction. Plaintiff's expert, Dr. Gordon, who advocated such alterations to achieve a better racial balance, admittedly did not consider such a practical sentiment in the course of his evaluation. Gordon Deposition at 134. Much more in keeping with the proper balance of practicality and a school board's affirmative obligation to move forward with projects without perpetuating the dual system is the poignant testimony of the Chairman of the School Board, Mr. Hicks. Though a long proponent of consolidation, Hicks recognized that the Plan represented a sensible, yet hard-won political compromise by which all races benefitted:

> I think the first priority there's never any question, everybody on the board unanimously from day one has always known [that] Luthersville/McCrary is our biggest need . . . [T]he board members from the south and the north have consistently, said, if we don't do anything else, that elementary will be built. So that was the first priority under anybody's plan . . . The [Greenville] high school had to be the second priority to get a plan period. To get unanimous board approval, the high school had to be the second priority. That was the way the plan developed. For the folks to salvage something from this ten years [of litigation], that high school had to be the second priority. So then it just comes down to how much you're talking about. If you're talking twelve million dollars or a limited amount of money, there's only one more project and Warm Springs is the oldest elementary school we have in the county. It's the oldest physical facility we have in the county. Greenville and Woodbury have been – are in much better physical shape than the Warm Springs one is and if you want to go back and look, the oldest renovated elementary we have in the county, the last time renovations were done to any of them, the oldest one is Manchester . . . To pass this bond referendum, we have got to have the support in the south part of the county [the population center]. You're not going to pass the bond referendum without support in the south part of the county.

Hicks Deposition at 75-76.

13

Meriwether County is constitutionally acceptable, and is consistent with the preexisting court decrees.

## B.     Transportation

The district court also found in response to Plaintiffs' objections to the Plan's effects on transportation that any transportation "disruption(s)" would stem from demographic factors and not a constitutionally suspect scheme of segregation.[15]  In so finding, the court was deducing from Freeman, 503 U.S. at 467, 112 S.Ct. at 1430,  that because racial imbalances in attendance zones resulting from demographics and not prior de jure segregation are not unconstitutional, then disproportionate transportation burdens stemming from demographic sources are likewise not unconstitutional.   Again, it is undisputed that Meriwether County's population center is in its southern region and that more of the white population resides in this section of the county than the central or northern sections of the county.  Consequently, the fact that white students may be somewhat less burdened by the transportation scheme is a function of demographics and not a constitutional violation.  In light of Freeman, we cannot say that the district court clearly erred in so finding.

## C.     Faculty/Staff Assignments and Extracurricular Activities

The district court expressly refers to faculty and staff assignments in its order, but concludes "because no assignments have been made and because faculty and administrators

_____

[15] As the district court pointed out, because there are no pupil locator maps cataloging students by race and residence, it is difficult, if not impossible, to make accurate predictions concerning the changes in travel times and distances under the Plan.  Thus, there is no actual evidence in the record that there will be such disproportion.  However, the district court assumed arguendo in its evaluation of the Plan that black students in the central and northern areas of the county would be disproportionately burdened.

14

can change from year to year, this court is unwilling to assume an improper assignment of faculty or administrators based upon the speculations of Dr. Gordon, the government, and intervenors." Order at 8. Therefore, the court decided "the more prudent approach is to wait and see what changes are actually made and then decide whether those changes were improper." Id. None of the briefs to this Court address the matter and Plaintiffs' briefs to the district court are not particularly helpful either, citing only general concerns that the Plan will result in excess faculty and that the Plan will not address the racial identifiability of faculty and administrator assignments. Defendants respond by arguing that it is premature to criticize the assignments before they have been made. Especially in light of the lack of adversarial development with respect to faculty and staff assignments, we find the "wait and see" approach of the district court is not an abuse of discretion. With respect to extracurricular activities, there was no mention of this Green factor, in the briefs to our Court or in the briefs to the district court. We assume that the district court also took a "wait and see" approach with respect to this factor, as it did with the faculty/staff assignment factor, and we find no abuse of discretion.

> D. Facilities

With respect to the facilities called for under the Plan, Plaintiffs make several objections. First, they object to the construction priorities in the overall Plan. Under Phase 1, two new consolidated elementary schools would be built: a new North Elementary School, combining the populations of Luthersville and McCrary school, and a new South Central Elementary, combining the populations of Manchester Elementary and Warm

15

Springs.  Finally, a new high school was planned for the Greenville area.[16]  Plaintiffs contend that Phase 1 of the Plan results in "putting white children first [because it] is easier to sell to the citizenry that must vote for the bond issue."[17]  Brief of United States at 33. This argument is without merit.

Two out of the three new structures proposed by the Plan would benefit student populations which would be predominantly black.  The new North Elementary School is

---

[16] Phase 1 of the Plan is projected to cost around $19 million, with $6 million coming from an allocation of state funds, and $13 million to come from the successful September 1996 bond issue.  Phase 2 of the Plan is projected to cost around $8.5 million.  Phase 2 entails building a new Central Elementary School, combining the populations of Greenville and Woodbury Elementary Schools, renovating the former Greenville High School to transform it into a true middle school, and renovating Manchester Middle and High Schools.  Plaintiffs vigorously objected in the district court to Phase 1 of the Plan on the ground that the Board could never successfully pass the bond issue necessary to begin Phase 1 construction.  Given the referendum's subsequent success, that argument is obviously moot.  Now Plaintiffs assert, as they did regarding Phase 1, that the funding for Phase 2 is speculative at best and may never be locked into place.  Because the Board has demonstrated its good faith in steering this Plan through the treacherous course of litigation and public debate, we are hesitant to assume that Phase 2 will never be pursued.  The Board has already accomplished more than Plaintiffs ever thought it could by successfully securing financing for Phase 1.  Consequently, we will not assume that Phase 2 will fail before it has even had the opportunity to be pursued in good faith. If it becomes clear the Board has no intention of pursuing Phase 2, the Plaintiffs may petition the district court for relief at that juncture.

[17] Rather than include the new South Elementary School as part of Phase 1, Plaintiffs contend that a new Central Elementary School ought to be built as part of Phase 1.  Central Elementary will combine the present populations of Greenville and Woodbury Elementary Schools.  However, this would do nothing to redress the severe overcrowding at Warm Springs Elementary, where many of the students must attend class in portable units.  Under the current Plan, a new South Elementary would be built, thus remedying the poor conditions at Warm Springs; and a new North Meriwether High school would be built to replace Greenville High School, thus allowing students  of middle school age from Greenville Elementary to move into the former Greenville High School facility.  Under the Board's Plan, no students would have to attend school in overcrowded portable units, whereas under Plaintiffs' proposed course, the unfortunate circumstances at Warm Springs would persist.

16

projected to be 62% black and 37% white and replaces Luthersville Elementary and McCrary Elementary, which were 55% and 88% black, respectively. The new Greenville High School is projected to be 80% black, replacing the current Greenville High School which is 79% black. The only new facility included as part of Phase 1 that is projected to be majority white is the new South Elementary, which will be 50% white and 49% black. We fail to see how replacing two predominantly black schools puts white children first.

We refer again to the helpful comments of Mr. Hicks, supra note 14, which indicate that the construction priorities were determined on the basis of need, not race, with a watchful eye on what was practicable. The southern elementary schools were the oldest in the county, and in worse physical shape than the substitute project suggested by Plaintiffs. We do not believe it was unreasonable for the Board to include the South Elementary School project in Phase 1. Nor was it unreasonable[18] for the Board to consider the fact that it would enhance the chances of passage of the bond issue for Phase 1 to include a fair allocation of resources to the southern portion of the county, the population center of the county. As Mr. Hicks noted, the bond issue (and thus the construction of the two predominantly black schools) was likely to fail without a fair allocation for the southern population center. We reject Plaintiffs' argument that this well-discussed and well-bargained political compromise runs afoul of the constitutional guideposts set out in Green. Indeed, it is Green that counsels us to recall "[t]hat the burden on a school board today is to

---

[18] The district court's finding that these decisions were reasonable and the finding that these decisions reflected no racial discrimination have ample support in the record.

17

come forward with a plan that promises realistically to work, and promises realistically to work now." Green, 391 U.S. 497, 88 S.Ct. at 1694. We agree with the district court that the Board, after twelve years of debate, has produced a Plan that honors its desegregation obligations under the 1973 Order and under the case law, and successfully incorporates a bond issue for Phase 1 construction which has already passed.

Plaintiffs also object to the physical plant of the proposed new North Meriwether High School. Specifically, they allege that the new high school, though technologically superior, will lack important features that the old Greenville High School possesses, such as a ballfield and an auditorium. The Board counters that the architectural plans it presented to the district court demonstrate the presence of both a gymnasium and a cafetorium.[19] Thus, the only feature that the new North Meriwether County High School would lack is a ballfield with stadium seating. The Board provides a reasonable explanation for this absence: the field at the former Greenville high school can be utilized until a new one can be financed. In any event, we find that the Plaintiffs' argument in this regard fails to demonstrate the sort of constitutional transgression forbidden under Green and its progeny.

## V. CONCLUSION

Having carefully considered the district court's order, the Board's Plan, the Plaintiffs' objections to both, and the school district's response thereto, we conclude that

---

[19] Apparently, a "cafetorium" employs a multipurpose design, incorporating auditorium features, and functions as both a cafeteria and, when appropriate, as an auditorium.

18

the district court did not abuse its discretion in approving the Board's Plan.  We agree with the judgment of the district court that the Meriwether County School Board in pursuing its proposed Facilities Plan district has complied with the constitutional mandate of Green to the extent practicable.  Accordingly, we hold that the school district has addressed the significant and unquestioned needs of its antiquated system, while striking the proper balance between its desegregation obligations and its obligation to the citizens of Meriwether County to come forward with a realistic plan that promises to work, and to work now.  We conclude that the district court did not abuse its discretion in approving the Plan; the Plan is consistent with the Board's desegregation obligations under the previous orders and with the relevant case law outlining the Board's constitutional obligations.

The judgment of the district court approving the Plan is therefore

**AFFIRMED**.