737 F.2d 952
 18 Ed. Law Rep. 550
 Anthony T. LEE, et al., Plaintiffs-Appellants,
United States of America, Plaintiff-Intervenor, Appellee,
National Education Association, Inc., Plaintiff-Intervenor,
v.
ANNISTON CITY SCHOOL SYSTEM, Defendant-Appellee.
 No. 83-7231.
 United States Court of Appeals,
Eleventh Circuit.
 July 26, 1984.
 
 Gray, Seay & Langford, Solomon S. Seay, Jr., Montgomery, Ala., for defendant-appellee.
 Caryl P. Privett, Asst. U.S. Atty., Birmingham, Ala., Mark L. Gross, Civil Rights Div., Appellate Sec., Dept. of Justice, Washington, D.C., Burnham, Klinefelter, Halsey & Love, J.L. Klinefelter, Herbert D. Jones, Jr., Anniston, Ala., Miriam R. Eisenstein, Civil Rights Div., Appellate Sec., William Bradford Reynolds, U.S. Atty., Dept. of Justice, Washington, D.C., Frank Donaldson, U.S. Atty., Birmingham, Ala., for plaintiffs-appellants.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 The plaintiffs-appellants appeal a district court order issued as part of the court's continuing jurisdiction over the Anniston city school system. The court's order granted defendant Anniston School Board's petition for approval of the construction of a new middle school. The plaintiffs contend that the district court erred in approving the plan, because the plan does not achieve the greatest desegregation possible and because it involves the closing of a school in a black neighborhood, which the plaintiffs argue is racially motivated. Concluding that the district court did not abuse its discretion in approving the petition, we affirm.
 
 I.
 
 2
 This litigation traces its origins back to the case of Lee v. Macon County Board of Education, 429 F.2d 1218 (5th Cir.1970), in which this court approved a desegregation order by the District Court for the Middle District of Alabama for the Anniston school system. Jurisdiction over the Anniston school system was later transferred to the Northern District of Alabama. Two more desegregation orders were entered by that court in 1973 and 1975, and the school system has been operating without significant court involvement since the 1975 order.
 
 
 3
 In 1979, the Board of Education commissioned a biracial citizens committee (Citizens Organized for Better Education or COBE) to further community involvement in the educational process. A COBE subcommittee subsequently commissioned an educational specialist to evaluate existing facilities and make recommendations. The specialist in his report (the Owenby Report) found that Cobb Junior High was in a serious state of disrepair and urged that immediate action be taken to remedy the situation. Cobb Junior High, built in 1935, is located in a black residential area and currently serves grades 7 and 8.
 
 
 4
 After considerable debate and in light of the worsening physical condition of Cobb, the Board in 1982 voted to purchase a neutral site equidistant from black and white population centers for the construction of a new middle school (grades 6-8). The plan also contemplates building an elementary school at the Cobb site at a later date.
 
 
 5
 The five-member Board, including a black chairman and one other black member, decided on construction of a new school rather than renovation of Cobb for several reasons. First, the Cobb site had inadequate acreage for a middle school and was topographically unsuited. Second, the building of a new school at a neutral site was more economically feasible than acquiring adjacent land to the Cobb site and building new facilities. Third, the plan would allow the city to have a middle school by adding the 6th grade, which the COBE committee found to be a desirable educational concept. Finally, the Board found that an alternative proposal to build the middle school at the Randolph Park site, located in a black residential area, was unfeasible because of transportation and safety problems.
 
 
 6
 The plaintiffs challenged the proposed plan in the district court, arguing that by closing down a school in a black residential area and building on a neutral site, an unequal burden was placed upon the black community. The plaintiffs also contended that the plan was racially motivated and based on an impermissible fear of "white flight" from the school system.
 
 
 7
 The district court in a thorough opinion rejected the plaintiffs' arguments, finding that the Board's adoption of the plan and rejection of other alternatives was reasonable and justified. After analyzing each alternative, the district court found that: "[t]he plan is void of any impermissible discriminatory intent" and that, rather than leading to resegregation, the plan "fosters and accomplishes greater desegregation ... further eradicat[ing] the vestiges of the former dual system." It is from this order that the plaintiffs appeal.
 
 II.
 
 8
 In carrying out its duty to eliminate the vestiges of unlawful desegregation in the school system, the district court has available to it the full panoply of remedial powers. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Lee v. Macon County Board of Education, 616 F.2d 805 (5th Cir.1980).[1] When reviewing a district court's desegregation order, an appellate court is limited to determining whether the court's order was an abuse of discretion, Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), and is bound by the district court's findings of fact unless clearly erroneous. See Ross v. Houston Independent School District, 699 F.2d 218, 226 (5th Cir.1983).
 
 
 9
 Although the federal courts have a broad constitutional mandate to ensure that a unitary school system is achieved, the Supreme Court has stressed "[s]chool authorities have the primary responsibility for elucidating, assessing and solving these problems ...." Milliken, 433 U.S. at 281, 97 S.Ct. at 2757 (quoting Brown v. Board of Education, 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955) (Brown II )) (emphasis in original). Consistent with this principle, one factor to consider when reviewing a proposed remedy is "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." Milliken, 433 U.S. at 280-81, 97 S.Ct. at 2757. Moreover, although a school system's demonstrated good faith in moving toward a unitary system does not lead to automatic acceptance of the school board's proposals, good faith is a relevant factor in determining whether a court abused its discretion in adopting the board's proposed plan. Morgan v. McDonough, 689 F.2d 265, 280 (1st Cir.1982).
 
 
 10
 The district court in this case found that "[d]uring the intervening ten years [from the 1973 order], the Board has consistently demonstrated to the court a good faith effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." The court further found that the proposed plan itself was adopted in good faith and that it "does not in any manner have the capacity to tend to reestablish a dual education system which has successfully been eliminated in Anniston through the operation of a unitary system for ten years."[2] It is within this context of the district court's findings of the Board's good faith that we approach the court's approval of the Board's plan.
 
 III.
 
 11
 The plaintiffs' first objection to the proposed plan is that the Board had available alternative options that would have led to greater desegregation than that achieved by the plan ultimately adopted. In support, they point to several options outlined in the Owenby Report: (1) adopting a kindergarten through 8th grade plan and abolishing junior high school or (2) building the new middle school at the Randolph Park area site.
 
 
 12
 Even assuming that these plans would achieve greater desegregation, which is not clear from the record, they do not lead to a conclusion that the district court abused its discretion in approving the Board's plan. The first option, adopting a kindergarten through eighth grade plan, would constitute a significant intrusion into the educational policymaking powers of the School Board. Where, as here, the Board has acted in good faith and has actively sought to desegregate the school system, a federal court would be unjustified in imposing such a drastic measure on the local authorities. Milliken, 433 U.S. at 280-81, 97 S.Ct. at 2757-2758; Morgan, 689 F.2d at 280. The Supreme Court cautioned against such actions in Swann: "It is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school board authorities whose powers are plenary. Judicial authority enters only when local authority defaults." Swann, 402 U.S. at 16, 91 S.Ct. at 1276. The district court found and the record makes evident that the local authorities have not defaulted on their obligation to pursue a unitary school system.
 
 
 13
 Likewise, the district court properly concluded that the Board acted reasonably in rejecting the Randolph Park site. The court found that the site posed transportation and safety problems due to the lack of a main traffic artery leading into the area and the presence of railroad tracks. When compared with the adopted plan, the district court thus concluded "that the use of the land at the Randolph Park elementary [site] was not nearly as viable an alternative as the site embodied in the plan ...." This finding is also amply supported by the record.
 
 
 14
 Finally, the plaintiffs argue that the closing of Cobb Junior High as a traditionally black school in a black residential area was racially motivated and unconstitutionally places the burden of desegregation on blacks. Although closing a school identifiable as black for discriminatory purposes alone would be unconstitutional, Lee v. Macon County Board of Education, 448 F.2d 746 (5th Cir.1971), the district court found here that "[t]here is simply no justification for an argument, much less a conclusion that the plan under consideration is impermissibly racially motivated." Indeed, the court found that the site for the new middle school was equidistant from black and white neighborhoods, and that the burden was placed equally on black and white students. Furthermore, the district court found that although the racial mix of one elementary school was adversely affected by the plan, the overall mix in the school system was significantly improved and that the plan held greater promise for future desegregation by attracting more white students from the surrounding area.[3] Given these factors and the fact that a new elementary school will be built on the Cobb site, we agree with the district court that the closing of Cobb Junior High was not racially motivated and was "reasonably related to the ultimate objective [of desegregation]." Valley v. Rapides Parish School Board, 646 F.2d 925, 938 (5th Cir.1981), cert. denied, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); see also Valley v. Rapides Parish School Board, 702 F.2d 1221, 1227 n. 7 (5th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983) (school closure acceptable as remedial device).
 
 IV.
 
 15
 The Board's plan was adopted after several years of public debate and careful consideration of the available options. The decisionmaking process involved active participation by both the white and black citizens of Anniston, and we agree with the district court that there is no evidence that the Board's ultimate adoption of the plan was racially motivated. Indeed, the record reveals just the opposite: a school system actively attempting to achieve greater desegregation within the limits of practicalities such as funding and transportation. Because we agree with the district court that the Board has shown by clear and convincing evidence that it acted reasonably and in a constitutional manner, and that the plan will result in further desegregation of the school system, the district court's order approving the defendant's plan is AFFIRMED.
 
 
 
 [1]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [2]
 The district court's statement that a unitary system has been achieved suggests that its continuing remedial jurisdiction over the Anniston school system may be coming to a close. Pasadena City Board of Education v. Spangler, 427 U.S. 424, 436-37, 96 S.Ct. 2697, 2704-2705, 49 L.Ed.2d 599 (1976); Morgan, 689 F.2d at 280. The defendant, however, has not challenged on appeal the court's continuing exercise of its jurisdiction. To the extent that achievement of a unitary system draws into question the district court's remedial jurisdiction over this case, we note that the plaintiffs' objections were properly within the court's federal question jurisdiction in contending that the defendants proposed plan was racially motivated and unconstitutionally leads to the reestablishment of a dual system
 
 
 [3]
 Although the plaintiffs are correct that fear of "white flight" from the school system does not justify delaying desegregation, Tasby v. Wright, 713 F.2d 90, 99 (5th Cir.1983), plans designed in part to attract white students into the schools are appropriate if they do not frustrate desegregation efforts. Id.; Davis v. East Baton Rouge School Board, 721 F.2d 1425, 1438 (5th Cir.1983). Because the plan here furthers desegregation, any added benefit of improving the racial mix of the school system by attracting more white students was not an impermissible factor for the Board or the district court to take into account