Willie Eugene PITTS, a minor, by his mother and next friend, Mrs. Anna Mae PITTS, Victor Martin; a minor, by his father and next friend, Robert L. Martin; Kelvin, Felicia, Alfred, Orma, and Alfredia Henderson, minors, by their mother and next friend, Rebecca Henderson, Patricia Joyce Reeves, a minor, by her mother and next friend, Mrs. Rosa Lee Reeves; Anthony Reed and Cecilia Searcy, minors, by their mother and next friend, Mrs. Juanita Searcy; Ned and Becky Stone, minors, by their father and next friend, Alfred E. Stone, Jr.; Joy, Bridget and Sandra Becker, minors, by their father and next friend, Louis E. Becker; Monica Rocker, a minor, by her father and next friend, Arthur "Rock" Rocker; John Johnson and Devett Smith, minors, by their mother and next friend, Ms. Eunice A. Smith; Frankie Prather, a minor, by guardian and next friend, Cynthia Scott, and her father and next friend, Major Scott; Princess Mills, a minor, by her father and next friend, Roger Mills; Mark Anthony Wharton, a minor, by his mother and next friend Doris Patillar; and all others similarly situated, Plaintiffs–Appellants, Cross–Appellees,

Ann T. Johnson, Intervening Plaintiff,

v.

Robert FREEMAN, Superintendent, Lyman Howard, Norma Travis, and Phil Mc Gregor, DeKalb County Board of

Education Members, Defendants–Appellees, Cross–Appellants.

Willie Eugene PITTS, et al.,
Plaintiffs–Appellants,
Cross–Appellees,

v.

Robert R. FREEMAN, et al.,
Defendants–Appellees,
Cross–Appellants.

Nos. 88–8687, 88–8775.

United States Court of Appeals,
Eleventh Circuit.

Oct. 11, 1989.

Rehearing and Rehearing In Banc
Denied Nov. 13, 1989.

, Marcia W. Borowski, Atlanta, Ga., for plaintiffs-appellants, cross-appellees.

Gary M. Sams, Weekes & Candler, Charles L. Weatherly, Weekes & Candler, J. Stanley Hawkins, Mark D. Welsh, Decatur, Ga., for defendants-appellees, cross-appellants.

Before FAY and HATCHETT, Circuit Judges, and ALLGOOD *, Senior District Judge.

HATCHETT, Circuit Judge:

In 1985, in this case, we stated:

The district court['s] ... characterization of the DeKalb County School System as unitary was error. As the defendants suggest, it is possible that the district court did not intend its use of the word 'unitary' to be equated with the unitary status that requires dismissal of the action. The court may have been stating merely that a constitutionally acceptable desegregation plan was implemented in 1969 thus making the school system unitary in some respects. Yet the district court committed error by applying the wrong standards of proof when it proceeded to require the plaintiffs to prove discriminatory intent, a requirement that ordinarily would be appropriate only after a finding of full unitary status.

Until the DeKalb County School System achieves unitary status, it has an affirmative duty to eliminate the effects of its prior unconstitutional conduct. The United States Supreme Court has held that a previously segregated school system is under an 'affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.'

*Pitts v. Freeman*, 755 F.2d 1423, 1426 (11th Cir.1985) ("*Pitts I*") (quoting *Columbus Board of Education v. Penick*, 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979) and *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968)). Despite our admonishments, the district court ruled that the DeKalb County School System ("DCSS") is under no affirmative

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

duty to take steps to desegregate an acknowledged segregated system in the area of student assignment because the DCSS closed all of its de jure black schools in 1969. Although we affirm the district court's ultimate conclusion that the DCSS has not yet achieved unitary status, we reverse the district court's ruling that the DCSS has no further duties in the area of student assignment.

## I. FACTS

### A. Racial Composition of the DeKalb County School System

#### 1. Students

The DeKalb County School System ("DCSS") serves 79,991 students in more than 90 schools.[1] Black students constitute 47-percent of the DCSS population. Despite the system's racial balance, 50-percent of the black students attend schools with black populations of more than 90-percent. Similarly, 27-percent of the DCSS's white students attend schools with white populations of more than 90-percent.[2] The DCSS operates a segregated school system.

The DCSS maintains several programs to combat segregation. First, the DCSS maintains a Minority-to-Majority program ("M-to-M" program) that permits students to transfer from schools in which their race is a majority to schools in which their race is a minority. Approximately 4,500 students, almost all black, participate in the M-to-M program. Second, the DCSS maintains a magnet school program that includes a performing arts program, two science programs, and a foreign language program. The DCSS plans to add at least five more programs, including two occupational education centers. Third, the DCSS maintains a court-appointed bi-racial committee to review proposed boundary line changes, school openings and closings, and the M-to-M program.

#### 2. Faculty and Staff

##### a. Administrators

Black persons constitute approximately 30-percent of DCSS elementary school administrators (principals, assistant principals, and lead teachers). Yet, black administrators constitute less than 10-percent of the administrators in majority white schools. Conversely, black administrators constitute 60-percent of DCSS administrators in schools with black populations of more than 81-percent. Additionally, the DCSS assigns 13 of 18 black elementary school principals to schools in which the black student population is more than 90-percent.

At the high school level, the DCSS employs 27-percent black administrators. The percentage of black administrators at each school rises according to the size of the black student population. In majority white high schools, black administrators constitute only 22-percent of the administrators. In high schools with black student populations between 41-percent and 80-percent, black administrators constitute 45-percent of the administrators. In high schools with black student populations of more than 81-percent, black administrators constitute more than 63-percent of the administrators. In addition, the DCSS assigns 4 of 5 black high school principals to schools with black student populations of more than 95-percent.

##### b. Teachers

Black teachers constitute approximately 27-percent of DCSS faculty. Yet, 17 school faculties deviate by more than 10-percent from the system average.

The DCSS maintains a transfer program for experienced teachers. Teachers with more than 3 years experience at one school may request a transfer to another school. During the 1986–87 school year, 182 teach-

---

1. The district court and the parties agreed to use September, 1986, as a cut-off date for statistical information. Statistics concerning white students include non-black minority students. Non-black minority students constitute less than 1-percent of the DCSS student population.

2. In addition, 62-percent of the DCSS's black students attend 30 schools with black populations at least 20-percent higher than the system average. Fifty-nine percent of its white students attend 37 schools with white populations at least 20-percent higher than the average.

ers requested transfers. The DCSS granted 83 requests. The district court found that the transfer program deterred the DCSS from achieving racial equality among its faculty.

### 3. Educational Resources
#### a. Faculty Experience

The district court found that the DCSS assigns experienced teachers and teachers with graduate degrees in a racially imbalanced manner. The district court presented this fact by grouping DCSS schools into three categories: (1) Type I schools (majority white students during last ten years); (2) Type II schools (changed from majority white students to majority black students during last ten years); and (3) Type III schools (majority black students during the last ten years). The following charts demonstrate the racial skew:

#### Average Number of Years Teaching

| ELEMENTARY SCHOOLS | Fall 1984 | Fall 1985 | Fall 1986 |
| --- | --- | --- | --- |
| Type I (majority white) | 9.55 | 10.22 | 9.79 |
| Type II (white to black) | 6.45 | 6.90 | 6.36 |
| Type III (majority black) | 5.24 | 5.46 | 5.19 |
| | | | |
| HIGH SCHOOLS | | | |
| Type I | 7.99 | 8.74 | 8.90 |
| Type II | 6.83 | 7.14 | 7.08 |
| Type III | 5.34 | 5.68 | 4.91 |

#### Percentage of Teachers with Graduate Degrees

| | ELEMENTARY SCHOOLS | HIGH SCHOOLS |
| --- | --- | --- |
| Type I | 75.76 | 76.05 |
| Type II | 61.84 | 64.34 |
| Type III | 52.63 | 64.32 |

#### b. Per Pupil Expenditures

Using 1984–1985 school year figures, the district court also found that the DCSS spends more money per white student than it spends per black student. The following chart demonstrates the racial imbalance:

#### Per Pupil Expenditures

| Type I | $2,833 |
| --- | --- |
| Type II | $2,540 |
| Type III | $2,492 |

**3.** When describing DeKalb County's overall population, the parties distinguished between "whites" and "non-whites." The parties included non-black minority individuals in the non-white category.

### B. Racial Composition of DeKalb County

Between 1950 and 1986, DeKalb County grew from 77,000 to 450,000 residents. This growth proceeded in a racially-skewed fashion. Black residents moved primarily to south DeKalb County and white residents moved primarily to north DeKalb County. For example, between 1970 and 1980, north DeKalb County's non-white population increased 102–percent to 15,365. South DeKalb County's non-white population, however, increased 661–percent to 87,-583. In addition, between 1975 and 1980, 37,000 white residents moved from south DeKalb County to neighboring counties.[3]

DeKalb County's demographic changes affected the DCSS. Between 1976–1986, the DCSS elementary school population declined 15–percent. During the same time, however, black elementary student enrollment increased 86–percent. At the high school level, DCSS enrollment declined 16–percent while black enrollment increased 119–percent.

### II. PROCEDURAL HISTORY
#### A. The DCSS Prior to 1969

Historically, the DCSS segregated its schools and programs according to law. In 1966, the DCSS replaced its dual system with a "freedom of choice" plan. Under the freedom of choice plan, a number of black students attended formerly de jure white schools. A majority of black students, however, still attended de jure black schools.[4]

In 1968, the Supreme Court decided *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The Court held: "'Freedom of choice' is not a sacred talisman.... [I]f it fails to undo segregation, other means must be used to achieve this end." *Green*, 391 U.S. at 440, 88 S.Ct. at 1695 (quoting *Bowman v. County School Board*, 382 F.2d 326, 333 (4th Cir.1967) (Sobeloff, J., concurring)).

**4.** In 1968, the DCSS closed Bruce Street High School, one of two de jure black high schools.

Within two months, a class of black students ("the plaintiffs") filed this action against the DCSS.

### B. History of this Litigation

On June 12, 1969, the district court entered an order that abolished the freedom of choice plan, enjoined the DCSS from discriminating on the basis of race, and required the DCSS to eliminate the vestiges of its dual system. The court further ordered the DCSS to close all remaining de jure black schools and to establish a neighborhood school attendance policy. The district court retained jurisdiction to ensure that the DCSS complied with its order. The DCSS closed all de jure black schools.

The case remained inactive until 1975, when the plaintiffs complained that the DCSS violated the 1969 plan. In 1976, the court ordered the DCSS to modify its M-to-M program by providing students with free transportation and to reassign faculty and staff members to approximate system-wide racial percentages. Additionally, the district court created the bi-racial committee referred to earlier in this opinion.

Between 1977 and 1979, the DCSS filed three motions in the district court, seeking approval of several plan modifications. In 1977, the district court approved a boundary line change for Flat Shoals Elementary School. In 1978, the district court refused to exclude kindergarten and special education programs from the M-to-M program. In 1979, the district court refused to modify the M-to-M program by restricting black student transfers to schools with black populations less than the system average.

In 1983, the plaintiffs returned to the district court contending, in part, that the DCSS improperly limited M-to-M transfers to predominately white Lakeside High School and that the DCSS's proposed expansion of predominantly white Redan High School would perpetuate segregation. The district court ordered the DCSS to accept additional black students in the M-to-M program at Lakeside High. The district court ruled, however, that the DCSS

did not maintain a discriminatory "intent" in deciding to expand Redan High. The district court concluded that the DCSS achieved unitary status. The plaintiffs appealed. In 1985, this court reversed and remanded the case. *Pitts I,* 755 F.2d 1423 (11th Cir.1985). The *Pitts I* court first held that the district court improperly declared that the DCSS achieved unitary status without notifying the plaintiffs and conducting a hearing. *Pitts I,* 755 F.2d at 1426 (citing *United States v. Texas Education Agency,* 647 F.2d 504, 509 (5th Cir. Unit A 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); *Lee v. Macon County Board of Education,* 584 F.2d 78, 81 (5th Cir.1978); *Youngblood v. Board of Public Instruction,* 448 F.2d 770, 771 (5th Cir.1971)). The court then held that the district court erred by considering the DCSS's intent when it analyzed the Redan expansion. The court stated that the DCSS possessed "an affirmative duty to solve the Redan High School overcrowding problem in such a way that it furthers desegregation and helps eliminate the effects of the previous dual school system." *Pitts I,* 755 F.2d at 1427.

On January 16, 1986, the DCSS filed a motion in the district court seeking final dismissal. In July, 1987, the district court conducted a three-week trial to determine whether the DCSS had achieved unitary status. In October, 1987, the plaintiffs filed two motions for supplemental relief based, in part, on testimony adduced at trial.

On June 30, 1988, the district court entered an order denying the DCSS's motion for dismissal. The district court ruled that the DCSS would not achieve unitary status until it filed a report that presented a plan sufficient to meet the dictates of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969) (in banc) (requiring racial equality in the assignment of teachers and principals), *rev'd per curiam on other grounds,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530, *cert. denied,* 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530 (1970).[5] The district court

---

5. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (in banc), the Eleventh Circuit

ruled that the DCSS would comply with *Singleton* when all schools possessed minority staffs within 15–percent of the system average. The court also ordered the DCSS to equally distribute its experienced teachers and teachers with advanced degrees and to equalize expenditures among black and white students. The district court refused, however, to impose additional duties on the DCSS in the areas of student assignment, transportation, and extracurricular activities. The court denied the plaintiffs' motion that asked the court to require the DCSS to file a separate junior high school plan.

On July 13, 1988, the plaintiffs filed a motion asking the district court to reconsider its decision not to impose additional duties on the DCSS in the area of student assignment. The plaintiffs also asked the court to reconsider its decision not to require the DCSS to file a junior high school plan. On August 11, 1988, the district court denied the plaintiffs' reconsideration motion.

On September 9, 1988, the district court certified "any issue" of its June 30, 1988 order for interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b) (West Supp.1989). Both parties appealed. On October 21, 1988, this court permitted the appeals to proceed.[6]

## III. CONTENTIONS OF THE PARTIES

The plaintiffs contend that the district court erroneously dismissed the DCSS from court supervision in the area of student assignment. The plaintiffs also contend that the district court erred by concluding that the DCSS could satisfy *Singleton* while allowing minority faculties to deviate by 15–percent from the system average.

The DCSS contends that it will achieve unitary status when it complies with *Sin-*

*gleton.* The DCSS also contends that it satisfied its duties relating to student assignment when it complied with the district court's 1969 order and closed all de jure black schools. The DCSS takes the position that it did not "cause" resegregation and that it possesses no duty to take affirmative action to desegregate. The DCSS further contends that the district court erred by ruling that it failed to equally distribute educational resources.

## IV. ISSUE

Whether the DCSS will achieve unitary status when it complies with the district court's orders regarding faculty and staff assignment and resource distribution.

## V. DISCUSSION

### A. Standard of Review

We review the district court's specific remedial orders regarding faculty and staff assignment and resource distribution for an abuse of discretion. *Lee v. Anniston City School System,* 737 F.2d 952, 955 (11th Cir.1984). "A declaration that a school has achieved unitary status is ... subject to review under the clearly erroneous standard." *Jacksonville Branch, NAACP v. Duval County School Board,* 883 F.2d 945, 952 n. 3 (11th Cir.1989); *United States v. Texas Educ. Agency,* 647 F.2d 504, 506 (5th Cir. Unit A 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

### B. Achieving Unitary Status

In *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (*"Brown I"*), the Supreme Court pronounced "that in the field of public education the doctrine of 'separate but equal' has no place.... [S]uch segregation is a denial of the equal protection of the laws."

adopted all Fifth Circuit decisions rendered before October 1, 1981, as binding precedent.

**6.** The parties filed identical appeals, asserting that 28 U.S.C.A. § 1292(a) (West Supp.1989) provided an appeal by right. After this court permitted the section 1292(b) appeals to proceed, the parties moved to consolidate the appeals. The court assigned Case No. 88–8775 to the section 1292(b) appeals and No. 88–8687 to the section 1292(a) appeals. Because we accepted jurisdiction pursuant to section 1292(b), we need not determine whether the parties properly appealed pursuant to section 1292(a).

One year later, the Supreme Court ruled that federal courts could assert equity jurisdiction to assure that school boards carried out the dictates of *Brown I. Brown v. Board of Education*, 349 U.S. 294,. 300–01, 75 S.Ct. 753, 756–57, 99 L.Ed. 1083 (1955) ("*Brown II*"). As the Court stated in *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968):

> *Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for successful resolution. School boards ... [were] clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.

District courts should not abdicate jurisdiction until a school board achieves "unitary status." *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 31, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971); *Pitts I*, 755 F.2d at 1426.

### 1. Defining Unitary Status

■ A school system achieves unitary status when it no longer discriminates between school children on the basis of race. *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1414 (11th Cir.1985) ("*Georgia NAACP*"); *Pitts I*, 755 F.2d at 1426; *Lee v. Macon County Board of Education*, 584 F.2d 78, 81 (5th Cir.1978). A school system "no longer discriminates between school children on the basis of race" when it affirmatively eliminates *all* vestiges of its dual system. *Columbus Board of Education v. Penick*, 443 U.S. 449, 458, 99 S.Ct. 2941, 2946, 61 L.Ed.2d 666 (1979) (school board under "continuous constitutional obligation to disestablish its dual school system"); *Swann*,

402 U.S. at 15, 91 S.Ct. at 1275 ("the objective today remains to eliminate from the public schools all vestiges of state-imposed segregation"); *Green*, 391 U.S. at 437–38, 88 S.Ct. at 1693–94 (school board charged with affirmative duty to eliminate racial discrimination "root and branch"). *See Georgia NAACP*, 775 F.2d at 1413 n. 12 (school system achieves unitary status when it eliminates vestiges of prior discrimination and operates a non-segregated system for a period of several years).[7] The district court erred by concluding that "there is no binding precedent in this circuit which articulates a precise definition for" unitary status and by following the non-binding definition of unitary status in *Brown v. Board of Education*, 671 F.Supp. 1290 (D.Kan.1987) ("*Brown III*"). *Pitts v. Freeman*, No. 11946 at 3 (N.D. Ga. June 30, 1988).

### 2. Applying the Definition of Unitary Status

■ Appellate courts have provided district courts with little guidance regarding how to determine whether a school system has achieved unitary status. *See* Note, *Eliminating the Continuing Effects of the Violation: Compensatory Education as a Remedy for Unlawful School Segregation*, 97 Yale L.J. 1173, 1190 (1988) (no guidelines exist for determining when school systems achieve unitary status); Note, *Allocating the Burden of Proof After a Finding of Unitariness in School Desegregation Litigation*, 100 Harv.L.Rev. 653, 662 (1987) ("The Supreme Court has not, however, announced any set list of the conditions a district court judge must observe in a formerly dual school system before declaring that it is unitary."). The district court considered six factors set forth in *Green:* student assignment, faculty, staff, transportation, extracurricular activities, and facilities.[8] *Green*, 391 U.S. at

---

7. The *Georgia NAACP* court set forth separate definitions for a "unitary school system" and for "unitary status." We reject this labeling system. Instead, we use the word "unitary" only when referring to the status that a school board must achieve to be freed from district court jurisdiction.

8. The district court also considered a seventh factor: "quality of education." We conclude that the *Green* Court intended quality of education to be considered in conjunction with each of its six enumerated factors. *See Green*, 391 U.S. at 435, 88 S.Ct. at 1692 (describing the six factors as comprising "every facet of school

435, 88 S.Ct. at 1692. A review of these six factors constitutes the best approach for determining whether a school system has eliminated the vestiges of a dual system. Therefore, we hold that district courts should review the six *Green* factors to determine whether a school system has achieved unitary status. If the school system fulfills all six factors *at the same time* for several years, the court should declare that the school system has achieved unitary status. If the school system fails to fulfill all six factors at the same time for several years, the district court should retain jurisdiction.[9]

Before applying the *Green* factors to the DCSS, we make three related conclusions.

First, the *Green* factors are not entirely synonymous with the vestiges of past discrimination. State-imposed segregation affected society much more than any set of judicially-created factors can measure. As Chief Justice Warren stated in *Brown I:*

> To separate [children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.

*Brown I,* 347 U.S. at 494, 74 S.Ct. at 691. An analysis of the *Green* factors simply provides a method for determining whether a school system has eliminated all vestiges of past discrimination while, at the same time, providing district courts with a degree of certainty. Application of the *Green* factors does not strip a district court of its responsibility and ability to consider unique circumstances in each school system. *See Keyes v. School District No. 1,* 413 U.S. 189, 224 n. 10, 93 S.Ct. 2686, 2705 n. 10, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part and dissenting in part) (cautioning courts to refrain from formulating "hard-and-fast rules" in school desegregation cases). The *Green* factors approach is a means towards an end. By requiring its use, we simply recognize that district courts cannot consistently apply a standardless test.

■ Second, our ruling that school boards must comply with the six *Green* factors simultaneously does not expand federal court equity jurisdiction beyond the scope of a school board's constitutional violation. *See Milliken v. Bradley,* 433 U.S. 267, 280–82, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977) (*"Milliken II"*). School boards violated the Constitution by operating dual systems. To remedy this violation, they must eliminate *all* of the dual system's vestiges. Because these vestiges encompass more than the *Green* factors, a district court can order relief relating to *any* factor until a school system achieves unitary status. The factors operate, in part, as an indicator of more intangible vestiges. Our conclusion is fully consistent with the Supreme Court's statement that: "[t]he district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. A district court may and should consider the use of all available techniques...." *Davis v. Board of School Commissioners,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1970) (citing *Swann,* 402 U.S. at 22–31, 91 S.Ct. at 1279–83).

■ Third, we reject the First Circuit's ruling which permits school systems to achieve unitary status incrementally. *Morgan v. Nucci,* 831 F.2d 313 (1st Cir.1987). *Cf. United States v. Overton,* 834 F.2d 1171, 1176 n. 17 (5th Cir.1987) (citing *Morgan* when discussing a post-unitary school system); *Lee v. Macon County Board of Education,* 681 F.Supp. 730, 738 (N.D.Ala. 1988) (praising *Morgan,* but recognizing that it does not constitute Eleventh Circuit law). A school system achieves unitary status or it does not. We will not permit

---

operations"). In this case, the district court should consider the distribution of educational resources in relation to the area in which the school system applies the resource.

**9.** By holding that the system must fulfill the *Green* factors "for several years," we mean a period of not less than three years. *See Youngblood v. Board of Public Instruction,* 448 F.2d 770, 771 (5th Cir.1971).

resegregation in a school system that has not eliminated all vestiges of a dual system. *See Dayton Board of Education v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (school boards possess affirmative responsibility to see that pupil assignment, school construction, and abandonment practices do not reestablish the dual school system); *Columbus Board of Education*, 443 U.S. at 460, 99 S.Ct. at 2948 (district court must ensure that school board actions "do not serve to perpetuate or reestablish the dual school system"); *Swann*, 402 U.S. at 21, 91 S.Ct. at 1278 (school systems may not perpetuate or reestablish dual system; "district courts should retain jurisdiction to assure that these responsibilities are carried out").

The DCSS asserts that Supreme Court authority permits it to achieve unitary status incrementally. Contrary to the DCSS's assertion, *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) does not support an incremental approach to school desegregation cases. In *Spangler*, the Court simply refused to approve the Pasadena School Board's rigid requirement that no minority comprise a majority of any school population. *Spangler*, 427 U.S. at 432, 96 S.Ct. at 2703 ("All that is now before us are the questions of whether the District Court was correct in denying relief when petitioners in 1974 sought to modify the 'no majority' requirement as then interpreted by the District Court."). *See* Note, 97 Yale L.J. at 1191 n. 104 (criticizing *Morgan* court for "wrongly citing [*Spangler*] for proposition that a district court may confer unitary status on pupil assignments even if other facets of the school system retain discriminatory vestiges").

### C. Applying the *Green* Factors

#### 1. Transportation, Extracurricular Activities, and Facilities

The district court concluded that the DCSS fulfilled its constitutional duties in the areas of transportation, extracurricular

activities, and facilities. Neither party appeals these rulings; therefore, those rulings are not before us.[10]

#### 2. Faculty and Staff

The former Fifth Circuit held that "principals, teachers, teacher-aides and other staff who work directly with children at school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students." *Singleton*, 419 F.2d at 1217–18. School systems, therefore, maintain legal responsibility for the allocation of minority faculty and staff. School systems and district courts must focus on minority ratios in *each* school. *Singleton*, 419 F.2d at 1218. The district court concluded that the DCSS failed to comply with *Singleton*. Specifically, the district court ruled that the DCSS would not satisfy *Singleton* until each school's minority staff ratio varied from the system average by no more than 15–percent. The court adopted this 15–percent guideline from its 1976 order.

Only the plaintiffs appeal the district court's *Singleton* ruling. The plaintiffs argue that the district court erred by permitting a 15–percent variance in each school. The plaintiffs cite two cases in which courts approved plans that permitted deviations of less than 10–percent. *See Tasby v. Estes*, 517 F.2d 92 (5th Cir.), *cert. denied*, 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975); *Smith v. Concordia Parish School Board*, 445 F.2d 285 (5th Cir.1971). The DCSS, however, argues that a 15–percent deviance rule does not constitute error. The DCSS points to a non-binding case in which a court approved a 15–percent deviance in some of a system's schools. *See United States v. Texas Education Agency*, 679 F.2d 1104 (5th Cir.1982).

We hold that the district court's *Singleton* order did not constitute an abuse of discretion. Our holding does not establish 15–percent as the standard for all cases; we merely find no abuse of discretion on

---

**10.** These matters may be considered the next time the district court considers whether the DCSS has achieved unitary status.

the facts of this case. Accordingly, we affirm the district court's decision permitting the DCSS to comply with *Singleton* when each school's minority staff varies from the system average by no more than 15–percent. We stress, however, that under this circuit's definition of unitary status, the DCSS must simultaneously comply with *Singleton* and the other *Green* factors for several years before it will achieve unitary status.

### 3. Student Assignment

In recent years, the DCSS student population has become increasingly segregated. The district court, however, refused to hold the DCSS responsible for this segregation because "no evidence [exists] that the school system's previous unconstitutional conduct may have contributed to this segregation." *Pitts v. Freeman*, No. 11946 at 25.

The plaintiffs argue that the DCSS never achieved a constitutionally-sufficient level of desegregation. The plaintiffs argue that until the DCSS achieves unitary status, it must affirmatively move toward the maximum practical level of desegregation. The plaintiffs also argue that demographic shifts do not excuse the DCSS's resegregation.

The DCSS argues that it fulfilled its duties in the area of student assignment when it closed all de jure black schools following the district court's 1969 order. The DCSS argues that the district court properly refused to find it responsible for segregation caused by demographic changes.

■ We hold that a school system that has not achieved unitary status must take affirmative steps to gain and maintain a desegregated student population. The DCSS may not shirk its constitutional duties by pointing to demographic shifts occurring prior to unitary status.[11] Accordingly, we reverse the district court's conclusion that the DCSS fulfilled its constitutional obligations in the area of student assignment.

#### a. Closing De Jure Black Schools

■ The DCSS has a continuing constitutional duty to achieve the greatest possible degree of desegregation and to prevent re-segregation. *Columbus Board of Education*, 443 U.S. at 460, 99 S.Ct. at 2948 (school board cannot "perpetuate or re-establish the dual school system"); *Davis*, 402 U.S. at 37, 91 S.Ct. at 1292 ("make every effort to achieve the greatest possible degree of actual desegregation"); *Green*, 391 U.S. at 440, 88 S.Ct. at 1695 ("continuing duty to take whatever action might be necessary"). The district court must continue to impose this duty on the DCSS until it removes *all* vestiges of the dual system.

The DCSS asserts that the district court could not hold it responsible for segregation not "caused" by its dual system. The DCSS cites *Milliken II*, 433 U.S. at 282, 97 S.Ct. at 2758 to support this assertion. We reject the DCSS's reading of *Milliken II*. The *Milliken II* Court did not require causation between each *Green* factor and a dual system. Rather, the *Milliken II* Court stated that "federal-court decrees must directly address and relate to the constitutional violation itself.... [F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or that does not flow from such a violation...." *Milliken II*, 433 U.S. at 281–82, 97 S.Ct. at 2757–58. As we stated earlier, the DCSS violated the Constitution by operating a dual system. Under *Milliken II*, federal court orders may address *all* vestiges of that system. Student segregation, prior to achieving unitary status, indicates that vestiges remain. Therefore, the DCSS must continue to work toward desegregation until it removes all vestiges. The fact that the DCSS achieved racial parity in the area of student assignment on the day it closed the de jure black schools does not demonstrate that it fulfilled its duties to achieve maximum possible desegregation

---

**11.** Segregated housing patterns are not new to the South. Certainly, lower federal courts have been aware of housing patterns since the 1954 *Brown* decision.

and to avoid the reestablishment of a dual system.

### b. Demographic Changes

■ We also reject the district court's refusal to require the DCSS to eradicate segregation caused by demographic changes. As the former Fifth Circuit stated in *Lee v. Macon County Board of Education*, 616 F.2d 805, 810 (5th Cir.1980):

'Not until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools.... Notwithstanding the school authorities' apparent good faith attempt to desegregate in 1970, the system has never achieved unitary status.... Consequently, the school board in Tuscaloosa is still under an affirmative duty to dismantle the dual system, regardless of current housing patterns. (Citing *Flax v. Potts*, 464 F.2d 865, 868–69 (5th Cir.), *cert. denied*, 409 U.S. 1007 [93 S.Ct. 433, 34 L.Ed.2d 299] (1972)).

We rejected a similar "demographics" argument in *Pitts I*. In *Pitts I*, the DCSS planned to accommodate white population growth in the Redan High School area by building an additional facility. The district court accepted the DCSS's plan, finding that the DCSS simply planned to build a school where students lived and that a discriminatory intent did not motivate the DCSS's actions. We noted the discriminatory effect of the proposed Redan expansion and held that "[u]ntil the DeKalb County School System achieves unitary status, it has an affirmative duty to eliminate the effects of its prior unconstitutional conduct." *Pitts I*, 755 F.2d at 1426. We repeat what we said in *Pitts I*: The DCSS has

not achieved unitary status; consequently, its affirmative duty remains in force.[12]

### c. Racial Quotas Are Not Required

■ In concluding that the DCSS failed to fulfill its constitutional duties regarding student assignment, we recognize that the Constitution does not require "any particular degree of racial balance or mixing." *Swann*, 402 U.S. at 24, 91 S.Ct. at 1280. *See Milliken II*, 433 U.S. at 280 n. 14, 97 S.Ct. at 2757 n. 14; *Spangler*, 427 U.S. at 434, 96 S.Ct. at 2703.[13] Accordingly, we do not require the DCSS to impose racial quotas in its schools. We do require, however, that the DCSS move *toward* the maximum possible level of desegregation. In direct conflict with Supreme Court authority and orders of this court, the DCSS claims no responsibility for student segregation based on its 1969 action of closing de jure black schools. The district court must increase its involvement in this case to ensure compliance with our order and the Constitution. The district court should require the DCSS to submit timely plans, establish firm deadlines, and require progress reports.

### d. The Junior High School Plan

The district court denied the plaintiffs' motion to compel the DCSS to file a junior high school plan because it concluded that the DCSS achieved maximum practical desegregation before the 1986–87 school year. Because we reverse the district court's conclusion that the DCSS achieved maximum practical desegregation, we order the district court to reconsider the plaintiffs' motion.

---

**12.** *See* Note, Unitary School Systems and Underlying Vestiges of State–Imposed Segregation, 87 Colum. L.Rev. 794, 808–09 (1987) (suggesting that residential segregation may itself be a vestige of a dual system and stating that "residential segregation as a vestige of unconstitutional school segregation may become the last barrier to widespread declarations of unitariness"). *See also Swann*, 402 U.S. at 20–21, 91 S.Ct. at 1278–79 ("People gravitate toward school facilities just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area

and have important impact on the composition of inner-city neighborhoods.").

**13.** This principle further undercuts the DCSS's argument that it fulfilled its duty to desegregate when it closed the de jure black schools. Just as the plaintiffs cannot base a claim of segregation on any particular degree of racial balance, the DCSS cannot support a claim of desegregation with racial percentages. "Substance, not semantics, must govern" school desegregation cases. *Swann*, 402 U.S. at 27, 91 S.Ct. at 1281.

## D. Distribution of Educational Resources

The district court ordered the DCSS to assign experienced teachers and teachers with advanced degrees equally between primarily black and primarily white schools. The district court also ordered the DCSS to equalize per pupil expenditures. The DCSS appeals this portion of the district court order, arguing that the district court improperly assigned it the burden of proof.[14]

To the extent that the district court required the DCSS to allocate educational resources in a race-neutral fashion, we affirm. We note, however, that the district court based its conclusion on an improper premise: that the DCSS may properly operate a segregated school system prior to reaching unitary status.[15] Under our holding, the DCSS must desegregate its students. When the system desegregates, most schools will no longer be racially identifiable and the DCSS will be unable to distribute resources in a racially imbalanced fashion.

## E. Disposition

 For many years, the DCSS planned, contributed to, and directly caused racial segregation in its schools. By operating a dual system, the DCSS affected the "hearts and minds" of its students and may have contributed to the housing patterns that today "cause" school segregation. *Swann*, 402 U.S. at 20–21, 91 S.Ct. at 1278–79; *Brown I*, 347 U.S. at 494, 74 S.Ct. at 691. The law requires that the DCSS achieve unitary status. The DCSS, however, refuses to take affirmative action and seeks to justify its inaction with frivolous and long-rejected arguments.

To comply with our mandate, the DCSS's actions "may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some." *Swann*, 402 U.S. at 28, 91 S.Ct. at 1282. The DCSS must consider pairing and clustering of schools, drastic gerrymandering of school zones, and grade reorganization. *See Swann*, 402 U.S. at 27–28, 91 S.Ct. at 1281–82. The DCSS and the district court must consider busing—regardless of whether the plaintiffs support such a proposal. The DCSS's neighborhood plan is not inviolable. *See Davis*, 402 U.S. at 37–38, 91 S.Ct. at 1291–92. The DCSS's M-to-M program and magnet program do not alone suffice to desegregate the schools. We note that the M-to-M program is not likely to desegregate white schools. Without extensive expansion, the magnet school programs are not likely to materially desegregate the system.[16]

After twenty years of court supervision, the DCSS continues to operate racially identifiable schools. The DCSS has never achieved unitary status and it retains the duty to eliminate all vestiges of the dual school system.

## VI. CONCLUSION

We hold that a school system does not achieve unitary status until it maintains at least three years of racial equality in six categories: student assignment, faculty, staff, transportation, extracurricular activities, and facilities. The DCSS has not achieved unitary status. We affirm the district court's conclusion that the DCSS failed to fulfill its duties in the areas of faculty and staff. We reverse the district court's conclusion that the DCSS fulfilled its duties in the area of student assignment. Accordingly, we order the district

---

**14.** The DCSS's burden of proof argument rests on the notion that they did not "cause" the resource inequity. We rejected this argument when we discussed student assignment. The DCSS "caused" all vestiges of the dual system by operating that system. Until the DCSS achieves unitary status it must continue to work toward eliminating *all* vestiges of the dual system.

**15.** We are not faced with the question of whether a school system may constitutionally operate a system that is in fact segregated after the

system has achieved unitary status, or whether "the spirit of *Brown*" would provide a cause of action for a new set of plaintiffs. *See Pitts I*, 755 F.2d at 1426 (district court may consider discriminatory intent only after a school system achieves full unitary status).

**16.** The magnet programs are voluntary and part-time, attracting less than 1-percent of the system's students.

court to require the DCSS to prepare and file a plan in accordance with this opinion in the shortest reasonable time.

AFFIRMED in part, REVERSED in part, and REMANDED.

